# SCHWEIKER ET AL. *v.* CHILICKY ET AL.

No. 86–1781.   Argued March 1, 1988—Decided June 24, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined, and in all but n. 3 of which STEVENS, J., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 430. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 430.

*Solicitor General Fried* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Willard, Deputy Solicitor General Ayer, Michael K. Kellogg, William Kanter,* and *Howard S. Scher.*

*Laurence H. Tribe* argued the cause for respondents. With him on the brief was *William E. Morris.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide whether the improper denial of Social Security disability benefits, allegedly resulting from violations of due process by government officials who administered the federal Social Security program, may give rise to a cause of action for money damages against those officials. We conclude that such a remedy, not having been included in the elaborate remedial scheme devised by Congress, is unavailable.

## I

## A

Under Title II of the Social Security Act (Act), the Federal Government provides disability benefits to individuals who have contributed to the Social Security program and who, because of a medically determinable physical or mental impairment, are unable to engage in substantial gainful work. 42 U. S. C. §§ 423(a), (d) (1982 ed. and Supp. IV). A very similar program for disabled indigents is operated under Title XVI of the Act, 42 U. S. C. § 1381 *et seq.* (1982 ed. and Supp. IV), but those provisions are technically not at issue in this case. Title II, which is administered in conjunction with state welfare agencies, provides benefits only while an individual's statutory disability persists. See 42 U. S. C. §§ 421(a), 423(a)(1) (1982 ed. and Supp. IV). In 1980, Congress noted that existing administrative procedures provided

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *Steven R. Shapiro, John A. Powell,* and *Helen Hershkoff;* and for the National Mental Health Association et al. by *Daniel M. Taubman* and *Peter Komlos-Hrobsky.*

for reexamination of eligibility "only under a limited number of circumstances." H. R. Conf. Rep. No. 96–944, p. 60 (1980); see also S. Rep. No. 96–408, pp. 60–61 (1979). Congress responded by enacting legislation requiring that most disability determinations be reviewed at least once every three years. Pub. L. 96–265, § 311(a), 94 Stat. 460, as amended, 42 U. S. C. § 421(i) (1982 ed. and Supp. IV). Although the statute did not require this program for "continuing disability review" (CDR) to become effective before January 1, 1982, the Secretary of Health and Human Services initiated CDR in March 1981.. See Pub. L. 96–265, § 311(b), 94 Stat. 460, note following 42 U. S. C. § 421; Brief for Petitioners 10.

The administration of the CDR program was at first modeled on the previous procedures for reexamination of eligibility. Under these procedures, an individual whose case is selected for review bears the burden of demonstrating the continuing existence of a statutory disability. The appropriate state agency performs the initial review, and persons who are found to have become ineligible are generally provided with administrative review similar to the review provided to new claimants. See 42 U. S. C. § 421(i) (1982 ed. and Supp. IV); Brief for Petitioners 10. Cf. *Mathews* v. *Eldridge,* 424 U. S. 319, 335–339 (1976). Under the original CDR procedures, benefits were usually terminated after a state agency found a claimant ineligible, and were not available during administrative appeals. See H. R. Conf. Rep. No. 98–1039, p. 33 (1984).

Finding that benefits were too often being improperly terminated by state agencies, only to be reinstated by a federal administrative law judge (ALJ), Congress enacted temporary emergency legislation in 1983. This law provided for the continuation of benefits, pending review by an ALJ, after a state agency determined that an individual was no longer disabled. Pub. L. 97–455, § 2, 96 Stat. 2498; see also Pub. L. 98–118, § 2, 97 Stat. 803. In the Social Security Disability

Benefits Reform Act of 1984 (1984 Reform Act), Congress extended this provision until January 1, 1988, and provided for a number of other significant changes in the administration of CDR. Pub. L. 98–460, §§ 2, 7, 98 Stat. 1794–1796, 1803–1804, 42 U. S. C. §§ 423(f), (g) (1982 ed. and Supp. IV). In its final form, this legislation was enacted without a single opposing vote in either Chamber. See 130 Cong. Rec. 26000, 26145–26146 (1984); see also *id.*, at 6621; *id.*, at 13247.

The problems to which Congress responded so emphatically were widespread. One of the cosponsors of the 1984 Reform Act, who had conducted hearings on the administration of CDR, summarized evidence from the General Accounting Office as follows:

> "[T]he message perceived by the State agencies, swamped with cases, was to deny, deny, deny, and, I might add, to process cases faster and faster and faster. In the name of efficiency, we have scanned our computer terminals, rounded up the disabled workers in the country, pushed the discharge button, and let them go into a free [f]all toward economic chaos." *Id.*, at 13218 (Sen. Cohen).

Other legislators reached similar conclusions. See, *e. g.*, *id.*, at 13234 (Sen. Moynihan) ("[T]he Social Security Administration has tried to reduce program cost by terminating the benefits of hundreds of thousands of truly disabled Americans"); *id.*, at 6583 (Rep. Rostenkowski) (alluding to "massive number of beneficiaries who have lost their benefits over the last 3 years even though they are truly disabled and unable to work"). Such conclusions were based, not only on anecdotal evidence, but on compellingly forceful statistics. The Social Security Administration itself apparently reported that about 200,000 persons were wrongfully terminated, and then reinstated, between March 1981 and April 1984. *Id.*, at 25979 (Sen. Levin); see also *id.*, at 25989 (Sen. Byrd); *id.*, at 6588 (Rep. Conte). In the first year of CDR, half of those who were terminated appealed the decision, and "an

amazing two-thirds of those who appealed were being reinstated." *Id.*, at 25979 (Sen. Levin); see also *id.*, at 25986 (Sen. Heinz); *id.*, at 13244 (Sen. Glenn); S. Rep. No. 98–466, p. 18 (1984).

Congress was also made aware of the terrible effects on individual lives that CDR had produced. The chairman of the Senate's Special Committee on Aging pointed out that "[t]he human dimension of this crisis—the unnecessary suffering, anxiety, and turmoil—has been graphically exposed by dozens of congressional hearings and in newspaper articles all across the country." 130 Cong. Rec. 25986 (1984) (Sen. Heinz). Termination could also lead to the cut-off of Medicare benefits, so that some people were left without adequate medical care. *Id.*, at 13321–13322 (Sen. Durenberger); see also *id.*, at 6590 (Rep. Hammerschmidt). There is little doubt that CDR led to many hardships and injuries that could never be adequately compensated. See, *e. g.*, *id.*, at 6588–6589 (Rep. Regula).

## B

Respondents are three individuals whose disability benefits under Title II were terminated pursuant to the CDR program in 1981 and 1982. Respondents Spencer Harris and Dora Adelerte appealed these determinations through the administrative process, were restored to disabled status, and were awarded full retroactive benefits. Respondent James Chilicky did not pursue these administrative remedies. Instead, he filed a new application for benefits about a year and a half after his benefits were stopped. His application was granted, and he was awarded one year's retroactive benefits; his application for the restoration of the other six months' benefits is apparently still pending. See Brief for Petitioners 18, and n. 13; Brief for Respondents 3. Because the terminations in these three cases occurred before the 1983 emergency legislation was enacted, respondents experienced delays of many months in receiving disability benefits to

which they were entitled. All the respondents had been wholly dependent on their disability benefits, and all allege that they were unable to maintain themselves or their families in even a minimally adequate fashion after they were declared ineligible. *Id.*, at 7–8. Respondent James Chilicky was in the hospital recovering from open-heart surgery when he was informed that his heart condition was no longer disabling. *Id.*, at 7.

In addition to pursuing administrative remedies, respondents (along with several other individuals who have since withdrawn from the case) filed this lawsuit in the United States District Court for the District of Arizona. They alleged that petitioners—one Arizona[1] and two federal officials who had policymaking roles in the administration of the CDR program—had violated respondents' due process rights. The thrust of the complaint, which named petitioners in their official and individual capacities, was that petitioners had adopted illegal policies that led to the wrongful termination of benefits by state agencies. Among the allegations were claims that petitioners improperly accelerated the starting date of the CDR program; illegally refused to acquiesce in decisions of the United States Court of Appeals for the Ninth Circuit; failed to apply uniform written standards in implementing the CDR program; failed to give effect to dispositive evidence in particular cases; and used an impermissible quota

---

[1] Petitioner William R. Sims is director of the Arizona Disability Determination Service, which participates in the administration of Title II under the supervision of the Secretary of Health and Human Services. 42 U. S. C. § 421(a) (1982 ed. and Supp. IV). The Court of Appeals concluded, for jurisdictional purposes only, that Sims "was acting under color of federal law as an agent of the Secretary." 796 F. 2d 1131, 1135, n. 3 (CA9 1986) (opinion below). We may assume, *arguendo*, that if an action akin to the one recognized in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), would be available against the petitioners who were federal employees, it would also be available against Sims. In light of our disposition of the case, however, we need not decide the question.

system under which state agencies were required to terminate predetermined numbers of recipients. See 796 F. 2d 1131, 1133–1134 (1986) (opinion below). Respondents sought injunctive and declaratory relief, and money damages for "emotional distress and for loss of food, shelter and other necessities proximately caused by [petitioners'] denial of benefits without due process." *Id.*, at 1134, n. 2.

The District Court dismissed the case on the ground that petitioners were protected by a qualified immunity. Their alleged conduct, the court concluded, did not violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" App. to Pet. for Cert. 16a (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)). Although the court discussed only the claims involving acceleration of the starting date for CDR and nonacquiescence in Ninth Circuit decisions, its qualified immunity holding apparently applied to respondents' other claims as well.

Respondents appealed, pressing only their claims for money damages against petitioners in their individual capacities. These claims, noted the Court of Appeals, are "predicated on the constitutional tort theory of *Bivens* v. *Six Unknown Named Agents*, 403 U. S. 388 . . . (1971)." 796 F. 2d, at 1134. Petitioners argued that the District Court lacked subject matter jurisdiction because the procedures set forth in 42 U. S. C. § 405(g), which do not authorize judicial review in a case like this one, provide the exclusive means of judicial redress for actions "arising under" the relevant provisions of the Act. The Court of Appeals rejected this argument, holding that subject matter jurisdiction existed because respondents' claims for emotional distress "arose under" the Due Process Clause of the Fifth Amendment rather than under the statute. The Court of Appeals went on to affirm the District Court to the extent that it dismissed the claims involving acceleration of the CDR program and nonacquiescence in Ninth Circuit decisions. As to respondents' other claims, however, the Court of Appeals con-

cluded that "[i]t cannot be determined as a matter of law that [respondents] could prove no state of facts . . . that resulted in violations of their due process rights and consequent damages." 796 F. 2d, at 1139.[2] The case was accordingly remanded for further proceedings, including a trial if necessary.

The petition for certiorari presented one question: "Whether a *Bivens* remedy should be implied for alleged due process violations in the denial of social security disability benefits." We granted the petition, 484 U. S. 814 (1987), and now reverse.

## II

### A

The Constitution provides that federal courts may be given original jurisdiction over "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U. S. Const., Art. III, §§ 1, 2. Since 1875, Congress has provided the federal trial courts with general jurisdiction over such cases. See Judiciary Act of March 3, 1875, § 1, 18 Stat. 470; 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3561 (2d ed. 1984); American Law Institute, Study of the Division of Jurisdiction between State and Federal Courts 162–163 (1969). The statute currently provides that the "district courts shall have original

---

[2] The Court of Appeals described the remaining allegations as follows:

"1. Knowing use of unpublished criteria and rules and standards contrary to the Social Security Act.

"2. Intentional disregard of dispositive favorable evidence.

"3. Purposeful selection of biased physicians and staff to review claims.

"4. Imposition of quotas.

"5. Failure to review impartially adverse decisions.

"6. Arbitrary reversal of favorable decisions.

"7. Denial of benefits based on the type of disabling impairment.

"8. Unreasonable delays in receiving hearings after termination of benefits." 796 F. 2d, at 1138.

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. § 1331.

In 1971, this Court held that the victim of a Fourth Amendment violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court. *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388. The Court noted that Congress had not specifically provided for such a remedy and that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation." *Id.*, at 396. Nevertheless, finding "no special factors counselling hesitation in the absence of affirmative action by Congress," and "no explicit congressional declaration" that money damages may not be awarded, the majority relied on the rule that " 'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' " *Id.*, at 396–397 (quoting *Bell* v. *Hood*, 327 U. S. 678, 684 (1946)).

So-called *"Bivens* actions" for money damages against federal officers have subsequently been permitted under § 1331 for violations of the Due Process Clause of the Fifth Amendment, *Davis* v. *Passman*, 442 U. S. 228 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, *Carlson* v. *Green*, 446 U. S. 14 (1980). In each of these cases, as in *Bivens* itself, the Court found that there were no "special factors counselling hesitation in the absence of affirmative action by Congress," no explicit statutory prohibition against the relief sought, and no exclusive statutory alternative remedy. See 442 U. S., at 246–247; 446 U. S., at 18–20.

Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts. The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the

officers responsible for the violation. Thus, in *Chappell* v. *Wallace*, 462 U. S. 296 (1983), we refused—unanimously—to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers and who had no remedy against the Government itself:

> "The special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel—would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command. . . .

> "Also, Congress, the constitutionally authorized source of authority over the military system of justice, has not provided a damages remedy for claims by military personnel that constitutional rights have been violated by superior officers. *Any action to provide a judicial response by way of such a remedy would be plainly inconsistent with Congress' authority in this field.*

> "Taken together, the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." 462 U. S., at 304 (emphasis added; citation omitted).

See also *United States* v. *Stanley*, 483 U. S. 669, 681 (1987) (disallowing *Bivens* actions by military personnel "whenever the injury arises out of activity 'incident to service'").

Similarly, we refused—again unanimously—to create a *Bivens* remedy for a First Amendment violation "aris[ing] out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush* v. *Lucas*, 462 U. S. 367, 368 (1983). In that case, a federal employee was demoted, allegedly in violation of the First Amendment,

for making public statements critical of the agency for which he worked. He was reinstated through the administrative process, with retroactive seniority and full backpay, but he was not permitted to recover for any loss due to emotional distress or mental anguish, or for attorney's fees. See *id.*, at 371, 372, and nn. 8–9; *id.*, at 390–391 (MARSHALL, J., concurring). Concluding that the administrative system created by Congress "provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies," *id.*, at 386 (footnote omitted), the Court refused to create a *Bivens* action even though it assumed a First Amendment violation and acknowledged that "existing remedies do not provide complete relief for the plaintiff," 462 U. S., at 388. See also *id.*, at 385, n. 28 (no remedy whatsoever for short suspensions or for adverse personnel actions against probationary employees). The Court stressed that the case involved policy questions in an area that had received careful attention from Congress. *Id.*, at 380–388. Noting that the Legislature is far more competent than the Judiciary to carry out the necessary "balancing [of] governmental efficiency and the rights of employees," we refused to "decide whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights." *Id.*, at 389, 390.

In sum, the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

## B

The administrative structure and procedures of the Social Security system, which affects virtually every American, "are of a size and extent difficult to comprehend." *Richardson* v. *Perales*, 402 U. S. 389, 399 (1971). Millions of claims are filed every year under the Act's disability benefits programs alone, and these claims are handled under "an unusually protective [multi]-step process for the review and adjudication of disputed claims." *Heckler* v. *Day*, 467 U. S. 104, 106 (1984).

The steps provided for under Title II are essentially identical for new claimants and for persons subject to CDR. An initial determination of a claimant's eligibility for benefits is made by a state agency, under federal standards and criteria. See 42 U. S. C. § 421(a) (1982 ed. and Supp. IV); see also 20 CFR §§ 404.1588–404.1599 (1987). Next, a claimant is entitled to *de novo* reconsideration by the state agency, and additional evidence may be presented at that time. §§ 404.907–404.922. If the claimant is dissatisfied with the state agency's decision, review may then be had by the Secretary of Health and Human Services, acting through a federal ALJ; at this stage, the claimant is again free to introduce new evidence or raise new issues. 42 U. S. C. § 421(d) (1982 ed., Supp. IV); 20 CFR §§ 404.929–404.965 (1987). If the claimant is still dissatisfied, a hearing may be sought before the Appeals Council of the Social Security Administration. §§ 404.967–404.983. Once these elaborate administrative remedies have been exhausted, a claimant is entitled to seek judicial review, including review of constitutional claims. 42 U. S. C. §§ 405(g), 421(d) (1982 ed. and Supp. IV); *Heckler* v. *Ringer*, 466 U. S. 602, 615 (1984); *Mathews* v. *Eldridge*, 424 U. S., at 332; *Weinberger* v. *Salfi*, 422 U. S. 749, 762 (1975). The Act, however, makes no provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits. As respondents concede, claimants whose benefits have been fully restored through the administrative process would lack stand-

ing to invoke the Constitution under the statute's administrative review provision. See Brief for Respondents 32–33.

The case before us cannot reasonably be distinguished from *Bush* v. *Lucas*. Here, exactly as in *Bush*, Congress has failed to provide for "complete relief": respondents have not been given a remedy in damages for emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits. Compare *Bush*, 462 U. S., at 372, n. 9, with 796 F. 2d, at 1134, n. 2 (opinion below). The creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed. Congress, however, has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were. Indeed, the system for protecting their rights is, if anything, considerably more elaborate than the civil service system considered in *Bush*. The prospect of personal liability for official acts, moreover, would undoubtedly lead to new difficulties and expense in recruiting administrators for the programs Congress has established. Congressional competence at "balancing governmental efficiency and the rights of [individuals]," *Bush*, *supra*, at 389, is no more questionable in the social welfare context than it is in the civil service context. Cf. *Forrester* v. *White*, 484 U. S. 219, 223–224 (1988).

Congressional attention to problems that have arisen in the administration of CDR (including the very problems that gave rise to this case) has, moreover, been frequent and intense. See, *e. g.*, H. R. Rep. No. 98–618, pp. 2, 4 (1984); S. Rep. No. 98–466, pp. 10, 17–18 (1984). Congress itself required that the CDR program be instituted. Within two years after the program began, Congress enacted emergency legislation providing for the continuation of benefits even after a finding of ineligibility by a state agency. Less than two years after passing that law, and fully aware of the results of extensive investigations of the practices that led to respondents' injuries, Congress again enacted legislation aimed

at reforming the administration of CDR; that legislation again specifically addressed the problem that had provoked the earlier emergency legislation. At each step, Congress chose specific forms and levels of protection for the rights of persons affected by incorrect eligibility determinations under CDR. At no point did Congress choose to extend to any person the kind of remedies that respondents seek in this lawsuit. Cf. 130 Cong. Rec. 6585–6586 (1984) (Rep. Perkins) (expressing regret that the bill eventually enacted as the 1984 Reform Act did not provide additional relief for persons improperly terminated during the early years of CDR). Thus, congressional unwillingness to provide consequential damages for unconstitutional deprivations of a statutory right is at least as clear in the context of this case as it was in *Bush*.

Respondents nonetheless contend that *Bush* should be confined to its facts, arguing that it applies only in the context of what they call "the special nature of federal employee relations." Brief for Respondents 40. Noting that the parties to this case did "not share the sort of close, collaborative, continuing juridical relationship found in the federal civil service," respondents suggest that the availability of *Bivens* remedies would create less "inconvenience" to the Social Security system than it would in the context of the civil service. See Brief for Respondents 44, 46–48. Petitioners are less sanguine, arguing that the creation of *Bivens* remedy in this context would lead to "a complete disruption of [a] carefully crafted and constantly monitored congressional scheme." Reply Brief for Petitioners 15.

We need not choose between these competing predictions, which have little bearing on the applicability of *Bush* to this case. The decision in *Bush* did not rest on this Court's belief that *Bivens* actions would be more disruptive of the civil service than they are in other contexts where they have been allowed, such as federal law enforcement agencies (*Bivens* itself) or the federal prisons (*Carlson* v. *Green*, 446 U. S. 14 (1980)). Rather, we declined in *Bush* "'to create a new sub-

stantive legal liability . . .' because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it." 462 U. S., at 390 (citation omitted). That reasoning applies as much, or more, in this case as it did in *Bush* itself.

Respondents also suggest that this case is distinguishable from *Bush* because the plaintiff in that case received compensation for the constitutional violation itself, while these respondents have merely received that to which they would have been entitled had there been no constitutional violation. See Brief for Respondents 20, n. 26 ("Bush's reinstatement was a remedy for the alleged abuse, not just a restoration of something to which he was entitled . . ."); see also *id.*, at 11 (failure to create a *Bivens* remedy "would give respondents precisely the same thing whether or not they were victims of constitutional deprivation and would thus leave respondents with no post-deprivation remedy at all for the constitutional violations they allege"). The *Bush* opinion, however, drew no distinction between compensation for a "constitutional wrong" and the restoration of statutory rights that had been unconstitutionally taken away. Nor did it suggest that such labels would matter. Indeed, the Court appeared to assume that civil service employees would get "precisely the same thing whether or not they were victims of constitutional deprivation." *Ibid.;* see *Bush*, 462 U. S., at 386 (civil service statute "provides meaningful remedies for employees who may have been *unfairly* disciplined for making critical comments about their agencies") (emphasis added; footnote omitted). *Bush* thus lends no support to the notion that statutory violations caused by unconstitutional conduct necessarily require remedies in addition to the remedies provided generally for such statutory violations. Here, as in *Bush*, it is evident that if we were "to fashion an adequate remedy for every wrong that can be proved in a case . . . [the complaining party] would obviously prevail." *Id.*, at 373. In neither case, however, does the presence of alleged unconstitutional

conduct that is not *separately* remedied under the statutory scheme imply that the statute has provided "no remedy" for the constitutional wrong at issue.

The remedy sought in *Bush* was virtually identical to the one sought by respondents in this case: consequential damages for hardships resulting from an allegedly unconstitutional denial of a statutory right (Social Security benefits in one instance and employment in a particular Government job in the other). In light of the comprehensive statutory schemes involved, the harm resulting from the alleged constitutional violation can in neither case be separated from the harm resulting from the denial of the statutory right. Respondents' effort to separate the two does not distinguish this case from *Bush* in any analytically meaningful sense.

In the end, respondents' various arguments are rooted in their insistent and vigorous contention that they simply have not been adequately recompensed for their injuries. They say, for example:

> "Respondents are disabled workers who were dependent upon their Social Security benefits when petitioners unconstitutionally terminated them. Respondents needed those benefits, at the time they were wrongfully withheld, to purchase food, shelter, medicine, and life's other necessities. The harm they suffered as a result bears no relation to the dollar amount of the benefits unjustly withheld from them. For the Government to offer belated restoration of back benefits in a lump sum and attempt to call it quits, after respondents have suffered deprivation for months on end, is not only to display gross insensitivity to the damage done to respondents' lives, but to trivialize the seriousness of petitioners' offense." Brief for Respondents 11.

We agree that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the "belated restoration of back benefits." The trauma to respondents, and thousands of others like them, must surely have gone beyond what anyone

of normal sensibilities would wish to see imposed on innocent disabled citizens.   Nor would we care to "trivialize" the nature of the wrongs alleged in this case.   Congress, however, has addressed the problems created by state agencies' wrongful termination of disability benefits.   Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program.   Cf. *Dandridge* v. *Williams*, 397 U. S. 471, 487 (1970).   Congress has discharged that responsibility to the extent that it affects the case before us, and we see no legal basis that would allow us to revise its decision.[3]

Because the relief sought by respondents is unavailable as a matter of law, the case must be dismissed.   The judgment of the Court of Appeals to the contrary is therefore

*Reversed.*

---

[3] The Solicitor General contends that Congress has explicitly precluded the creation of a *Bivens* remedy for respondents' claims.   Cf. *Bivens*, 403 U. S., at 397.   His argument rests on 42 U. S. C. § 405(h) (1982 ed., Supp. IV), which provides:

"The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing.   No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided.   No action against the United States, the Secretary, or any officer or employee thereof shall be brought under sections 1331 or 1346 of title 28 to recover on any claim arising under [Title II]."

Relying on *Heckler* v. *Ringer*, 466 U. S. 602, 614–616, 620–626 (1984), and *Weinberger* v. *Salfi*, 422 U. S. 749, 756–762 (1975), the Solicitor General has previously argued that the third sentence of this provision prevents any exercise of general federal-question jurisdiction under § 1331.   See *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 679 (1986).   Without deciding the question, we noted that arguments could be made for and against the Solicitor General's position.   *Id.*, at 679–680. We continue to believe that the exact scope of the third sentence's restriction on federal-question jurisdiction is not free from doubt; because we hold on other grounds that a *Bivens* remedy is precluded in this case, we need not decide whether § 405(h) would have the same effect.

430

JUSTICE STEVENS, concurring in part and concurring in the judgment.

Respondents have asserted that their claims arise under the Due Process Clause of the Fifth Amendment. In my opinion the Court should not reach the issue whether these claims may be brought directly under the Constitution without first deciding whether the Solicitor General is correct in his submission that Congress has enacted a statute that expressly requires dismissal of the complaint. See, *e. g.*, *Schweiker* v. *Hogan*, 457 U. S. 569, 585 (1982). I agree with the explanation in Part III–A of JUSTICE BRENNAN's opinion of why 42 U. S. C. § 405(h) does not preclude a *Bivens* remedy in this case. Accordingly, I join all of the Court's opinion except footnote 3.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Respondents are three individuals who, because they are unable to engage in gainful employment as a result of certain disabilities, rely primarily or exclusively on disability benefits awarded under Title II of the Social Security Act, 42 U. S. C. § 423 (1982 ed. and Supp. IV), for their support and that of their families. Like hundreds of thousands of other such recipients, in the early 1980's they lost this essential source of income following state implementation of a federally mandated "continuing disability review" process (CDR), only to have an administrative law judge (ALJ) ultimately reinstate their benefits after appeal, or to regain them, as respondent James Chilicky did, by filing a new application for benefits. Respondents allege that the initial benefit termination resulted from a variety of unconstitutional actions taken by state and federal officials responsible for administering the CDR program. They further allege, and petitioners do not dispute, that as a result of these deprivations, which lasted from 7 to 19 months, they suffered immediate financial hardship, were unable to purchase food, shelter, and

other necessities, and were unable to maintain themselves in even a minimally adequate fashion.

The Court today reaffirms the availability of a federal action for money damages against federal officials charged with violating constitutional rights. See *ante*, at 421. "'"[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."'" *Ibid.* (quoting *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 396–397 (1971), in turn quoting *Bell* v. *Hood*, 327 U. S. 678, 684 (1946)). Acknowledging that the trauma respondents and others like them suffered as a result of the allegedly unconstitutional acts of state and federal officials "must surely have gone beyond what anyone of normal sensibilities would wish to see imposed on innocent disabled citizens," *ante*, at 428–429, the Court does not for a moment suggest that the retroactive award of benefits to which respondents were always entitled remotely approximates full compensation for such trauma. Nevertheless, it refuses to recognize a *Bivens* remedy here because the "design of [the disability insurance] program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Ante*, at 423.

I agree that in appropriate circumstances we should defer to a congressional decision to substitute alternative relief for a judicially created remedy. Neither the design of Title II's administrative review process, however, nor the debate surrounding its reform contains any suggestion that Congress meant to preclude recognition of a *Bivens* action for persons whose constitutional rights are violated by those charged with administering the program, or that Congress viewed this process as an adequate substitute remedy for such violations. Indeed, Congress never mentioned, let alone debated, the desirability of providing a statutory remedy for such constitutional wrongs. Because I believe legislators of

"normal sensibilities" would not wish to leave such traumatic injuries unrecompensed, I find it inconceivable that Congress meant by mere silence to bar all redress for such injuries.

I

In response to the escalating costs of the Title II disability insurance program, Congress enacted legislation in 1980 directing state agencies to review the eligibility of Title II beneficiaries at least once every three years in order to ensure that those receiving benefits continued to qualify for such assistance. Pub. L. 96–265, § 311(a), 94 Stat. 460, as amended, 42 U. S. C. § 421(i) (1982 ed. and Supp. IV). Although the CDR program was to take effect January 1, 1982, the then-new administration advanced its starting date to March 1, 1981, and initiated what congressional critics later characterized as a "meat ax approach" to the problem of Social Security fraud. 130 Cong. Rec. 6594 (1984) (remarks of Rep. Alexander); id., at 6595 (remarks of Rep. Anthony). Respondents allege that in the course of their review proceedings, state and federal officials violated their due process rights by judging their eligibility in light of impermissible quotas, disregarding dispositive favorable evidence, selecting biased physicians, purposely using unpublished criteria and rules inconsistent with statutory standards, arbitrarily reversing favorable decisions, and failing impartially to review adverse decisions.

Whatever the merits of these allegations, a question that is not now before us, it is undisputed that by 1984 the CDR program was in total disarray. As the Court recounts, during the three years that followed the inauguration of the program, approximately 200,000 recipients lost their benefits only to have them restored on appeal. See ante, at 416. Just under half of all initial reviews resulted in the termination of benefits, H. R. Rep. No. 98–618, p. 10 (1984), yet nearly two-thirds of those who appealed regained their benefits. 130 Cong. Rec. 6598 (1984) (remarks of Rep. Levin);

see also S. Rep. No. 96–466, p. 18 (1984). Typically, appeals took anywhere from 9 to 18 months to process, during which time beneficiaries often lacked sufficient income to purchase necessities and also lost their eligibility for Medicare coverage. 130 Cong. Rec. 25979 (1984) (remarks of Sen. Levin). When Congress enacted the Social Security Disability Benefits Reform Act of 1984, approximately 120,000 contested eligibility decisions were pending on appeal, and federal courts had directed the agency to reopen another 100,000, *id.*, at 6588 (remarks of Rep. Conte); several "massive" class actions were pending in the federal courts challenging a number of the Social Security Administration's (SSA's) disability review policies and standards, Brief for Petitioners 14; and half the States either refused to comply with those standards or were barred by court orders from doing so, 130 Cong. Rec. 13218–13219 (1984) (remarks of Sen. Cohen); *id.*, at 6598 (remarks of Rep. Levin). Indeed, in April 1984, these debilitating challenges prompted the Secretary of Health and Human Services to call a halt to all further reviews by imposing a temporary, nationwide moratorium.

Chief among the problems Congress identified as contributing to this chaotic state of affairs was SSA's stringent medical improvement standard, which the agency applied in an adjudicative climate that some characterized as "rigorous," H. R. Rep. No. 98–618, at 10, and others denounced as "overzealous and callous." 130 Cong. Rec. 6596 (1984) (remarks of Rep. Fowler). Critics charged that under this strict standard, the agency terminated benefits by erroneously deeming medical impairments "slight" without evaluating the recipients' actual ability to work, and that the agency eliminated from the benefit rolls many other recipients whose medical condition had not changed at all by simply reevaluating their eligibility under the new, more stringent criteria. H. R. Rep. No. 98–618, at 6–7, 10–11. The harshness of both the standard and the results it produced led various Federal Courts of Appeals and a number of States to reject

it, which in turn produced widespread confusion and a near total lack of national uniformity in the administration of the disability insurance program itself.

Congress responded to the CDR crisis by establishing, for the first time, a statutory standard governing disability review. Designed primarily to end the practice of terminating benefits based on nothing more than a reassessment of old evidence under new eligibility criteria, the medical improvement standard permits the agency to terminate benefits only where substantial evidence demonstrates that one of four specific conditions is met.[1] In addition to establishing these substantive eligibility criteria and directing SSA to revise certain others,[2] Congress enacted several procedural re-

[1] Under the 1984 standard, the agency may terminate benefits only if (1) substantial evidence demonstrates that the recipient's impairment has medically improved and that he or she is able to engage in substantial gainful activity; (2) new and substantial medical evidence reveals that, although the recipient's condition has not improved medically, he or she has benefitted from medical or vocational therapy and is able to engage in substantial gainful activity; (3) new or improved diagnostic techniques or evaluations demonstrate that the recipient's impairment is not as disabling as was previously determined and that he or she is able to engage in substantial gainful activity; or (4) substantial evidence, including any evidence previously on record, demonstrates that a prior eligibility determination was erroneous. Pub. L. 98–460, § 2, 98 Stat. 1794–1796, 42 U. S. C. § 423(f) (1982 ed., Supp. IV).

Congress also barred any further certification of class actions challenging SSA's medical improvement criteria and directed a remand of all such pending actions in order to afford the agency an opportunity to apply the newly prescribed standard. Pub. L. 98–460, § 2(d), 98 Stat. 1797–1798, note following 42 U. S. C. § 423.

[2] The 1984 legislation directed SSA to revise its mental impairment criteria and extended an administratively imposed moratorium on mental impairment reviews until the new criteria were in place; mandated consideration of the combined effects of multiple impairments in cases where no single disability is sufficiently severe to establish a recipient's eligibility for benefits; and called for a study on the use of subjective evidence of pain in disability evaluations. Pub. L. 98–460, §§ 3, 4, 5, note following 42 U. S. C. § 421, 42 U. S. C. § 423(d)(2)(C), and note following 42 U. S. C. § 423 (1982 ed., Supp. IV).

forms in order to protect recipients from future erroneous deprivations and to ensure that the review process itself would operate in a fairer and more humane manner. The most significant of these protections was a provision allowing recipients to elect to continue to receive benefit payments, subject to recoupment in certain circumstances, through appeal to a federal ALJ, the penultimate stage of administrative review. See *ante*, at 424.[3]

## II

### A

In *Bivens* itself, we noted that, although courts have the authority to provide redress for constitutional violations in the form of an action for money damages, the exercise of that authority may be inappropriate where Congress has created another remedy that it regards as equally effective, or where "special factors counse[l] hesitation [even] in the absence of affirmative action by Congress." 403 U. S., at 396–397. Among the "special factors" the Court divines today in our prior cases is "an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Ante*, at 423. Describing congressional attention to the numerous problems the CDR process spawned as "frequent and intense," *ante*, at 425, the Court concludes that the very design of that process "suggests that Congress has provided what it

---

[3] Congress had previously responded to complaints concerning the high reversal rate of termination decisions by passing temporary legislation in 1983 that provided for interim payments during appeal through the ALJ stage, see Pub. L. 97–455, § 2, 96 Stat. 2498, 42 U. S. C. § 423(g) (1982 ed. and Supp. IV); see also H. R. Conf. Rep. No. 98–1039, p. 33 (1984). The 1984 Reform Act extended this authorization through January 1, 1988, and provided for recoupment of such payments in those cases where termination decisions are affirmed by SSA's Appeals Council, unless the agency determines that such recoupment would work an undue hardship. 42 U. S. C. § 423(g) (1982 ed., Supp. IV). In December 1987, Congress extended the interim payment provision through 1989. See § 9009 of the Omnibus Reconciliation Act of 1987, Pub. L. 100–203, 42 U. S. C. § 423(g)(1)(C) (1982 ed. and Supp. V).

considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Ante*, at 423. The cases setting forth the "special factors" analysis upon which the Court relies, however, reveal, by way of comparison, both the inadequacy of Title II's "remedial mechanism" and the wholly inadvertent nature of Congress' failure to provide any statutory remedy for constitutional injuries inflicted during the course of previous review proceedings.

In *Chappell* v. *Wallace*, 462 U. S. 296 (1983), where we declined to permit an action for damages by enlisted military personnel seeking redress from their superior officers for constitutional injuries, we noted that Congress, in the exercise of its "plenary constitutional authority over the military, has enacted statutes regulating military life, and has established a comprehensive internal system of justice to regulate military life . . . . The resulting system provides for the review and remedy of complaints and grievances such as [the equal protection claim] presented by respondents." *Id.*, at 302. That system not only permits aggrieved military personnel to raise constitutional challenges in administrative proceedings, it authorizes recovery of significant consequential damages, notably retroactive promotions. *Id.*, at 303. Similarly, in *Bush* v. *Lucas*, 462 U. S. 367 (1983), we concluded that, in light of the "elaborate, comprehensive scheme" governing federal employment relations, *id.*, at 385, recognition of any supplemental judicial remedy for constitutional wrongs was inappropriate. Under that scheme — which Congress has "constructed step-by-step, with careful attention to conflicting policy considerations," see *id.*, at 388, over the course of nearly 100 years — "[c]onstitutional challenges . . . are fully cognizable" and prevailing employees are entitled not only to full backpay, but to retroactive promotions, seniority, pay raises, and accumulated leave. *Id.*, at 386, 388. Indeed, Congress expressly "intended [to] put the employee 'in the same position he would have been in had the

unjustified or erroneous personnel action not taken place.'"
*Id.*, at 388 (quoting S. Rep. No. 1062, 89th Cong., 2d Sess., 1
(1966)).

It is true that neither the military justice system nor the
federal employment relations scheme affords aggrieved par-
ties full compensation for constitutional injuries; neverthe-
less, the relief provided in both is far more complete than
that available under Title II's review process. Although fed-
eral employees may not recover damages for any emotional
or dignitary harms they might suffer as a result of a constitu-
tional injury, see *Bush, supra,* at 372, n. 9, they, like their
military counterparts, are entitled to redress for most eco-
nomic consequential damages, including, most significantly,
consequential damage to their Government careers. Here,
by stark contrast, Title II recipients cannot even raise
constitutional challenges to agency action in any of the
four tiers of administrative review, see *ante,* at 424, and if
they ultimately prevail on their eligibility claims in those
administrative proceedings they can recover no consequen-
tial damages whatsoever. The only relief afforded persons
unconstitutionally deprived of their disability benefits is
retroactive payment of the very benefits they should have re-
ceived all along. Such an award, of course, fails miserably to
compensate disabled persons illegally stripped of the income
upon which, in many cases, their very subsistence depends.[4]

The inadequacy of this relief is by no means a product of
"the inevitable compromises required in the design of a mas-
sive and complex welfare benefits program." *Ante,* at 429.
In *Chappell* and *Bush,* we dealt with elaborate adminis-
trative systems in which Congress anticipated that federal of-
ficials might engage in unconstitutional conduct, and in which

---

[4] The legislative debate over the 1984 Reform Act is replete with anec-
dotal evidence of recipients who lost their cars and homes, and of some who
may even have died as a result of benefit terminations. See, *e. g.,* 130
Cong. Rec. 6588 (1984) (remarks of Rep. Regula); *id.,* at 6596 (remarks of
Rep. Glickman).

it accordingly sought to afford injured persons a form of redress as complete as the Government's institutional concerns would allow. In the federal employment context, for example, Congress carefully "balanc[ed] governmental efficiency and the rights of employees," *Bush*, 462 U. S., at 389, paying "careful attention to conflicting policy considerations," *id.*, at 388, and in the military setting it "established a comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the military structure." *Chappell, supra*, at 302.

Here, as the legislative history of the 1984 Reform Act makes abundantly clear, Congress did not attempt to achieve a delicate balance between the constitutional rights of Title II beneficiaries on the one hand, and administrative concerns on the other. Rather than fine-tuning "an elaborate remedial scheme that ha[d] been constructed step-by-step" over the better part of a century, Congress confronted a paralyzing breakdown in a vital social program, which it sought to rescue from near-total anarchy. Although the legislative debate surrounding the 1984 Reform Act is littered with references to "arbitrary," "capricious," and "wrongful" terminations of benefits, it is clear that neither Congress nor anyone else identified unconstitutional conduct by state agencies as the cause of this paralysis. Rather, Congress blamed the systemic problems it faced in 1984 on SSA's determination to control the cost of the disability insurance program by accelerating the CDR process and mandating more restrictive reviews. Legislators explained that, "[b]ecause of the abrupt acceleration of the reviews, . . . [s]tate disability determinations offices were forced to accept a three-fold increase in their workloads," 130 Cong. Rec. 13241 (1984) (remarks of Sen. Bingaman); yet despite this acceleration, SSA took no steps to "assur[e] that the State agencies had the resources to handle the greatly increased workloads," *id.*, at 13229 (remarks of Sen. Cranston), and instead put "pressure upon

[those] agencies to make inaccurate and unfair decisions."
*Id.*, at 13221 (remarks of Sen. Heinz).

Legislating in a near-crisis atmosphere, Congress saw itself as wrestling with the Executive Branch for control of the disability insurance program. It emphatically repudiated SSA's policy of restrictive, illiberal, and hasty benefit reviews, and adopted a number of prospective measures designed "to prevent further reckless reviews," *id.*, at 13229 (remarks of Sen. Cranston), and to ensure that recipients dependent on disability benefits for their sustenance would be adequately protected in any future review proceedings.

At no point during the lengthy legislative debate, however, did any Member of Congress so much as hint that the substantive eligibility criteria, notice requirements, and interim payment provisions that would govern *future* disability reviews adequately redressed the harms that beneficiaries may have suffered as a result of the unconstitutional actions of individual state and federal officials in *past* proceedings, or that the constitutional rights of those unjustly deprived of benefits in the past had to be sacrificed in the name of administrative efficiency or any other governmental interest. The Court today identifies no legislative compromise, "inevitable" or otherwise, in which lawmakers expressly declined to afford a remedy for such past wrongs. Nor can the Court point to any legislator who suggested that state and federal officials should be shielded from liability for any unconstitutional acts taken in the course of administering the review program, or that exposure to liability for such acts would be inconsistent with Congress' comprehensive and carefully crafted remedial scheme.

Although the Court intimates that Congress consciously chose not to afford any remedies beyond the prospective protections set out in the 1984 Reform Act itself, see *ante*, at 426, the one legislator the Court identifies as bemoaning the Act's inadequate response to past wrongs argued only that the legislation should have permitted all recipients, including

those whose benefits were terminated before December 31, 1984, to seek a redetermination of their eligibility under the new review standards. See 130 Cong. Rec. 6586 (1984) (remarks of Rep. Perkins). Neither this legislator nor any other, however, discussed the possibility or desirability of redressing injuries flowing from the temporary loss of benefits in those cases where the benefits were ultimately restored on administrative appeal. The possibility that courts might act in the absence of congressional measures was never even discussed, let alone factored into Congress' response to the emergency it faced.

The mere fact that Congress was aware of the prior injustices and failed to provide a form of redress for them, standing alone, is simply not a "special factor counselling hesitation" in the judicial recognition of a remedy. Inaction, we have repeatedly stated, is a notoriously poor indication of congressional intent, see, e. g., *Bob Jones University* v. *United States*, 461 U. S. 574, 600 (1983); *Zuber* v. *Allen*, 396 U. S. 168, 185–186, n. 21 (1969), all the more so where Congress is legislating in the face of a massive breakdown calling for prompt and sweeping corrective measures. In 1984, Congress undertook to resuscitate a disability review process that had ceased functioning: that the prospective measures it prescribed to prevent future dislocations included no remedy for past wrongs in no way suggests a conscious choice to leave those wrongs unremedied. I therefore think it altogether untenable to conclude, on the basis of mere legislative silence and inaction, that Congress intended an administrative scheme that does not even take cognizance of constitutional claims to displace a damages action for constitutional deprivations that might arise in the administration of the disability insurance program.

## B

Our decisions in *Chappell* and *Bush* reveal yet another flaw in the "special factors" analysis the Court employs

today. In both those cases, we declined to legislate in areas in which Congress enjoys a special expertise that the Judiciary clearly lacks. Thus, in *Chappell*, we dealt with military affairs, a subject over which "[i]t is clear that the Constitution contemplated that the Legislative Branch have plenary control." 462 U. S., at 301. Indeed, as we reaffirmed:

> "'[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.'" *Id.*, at 302 (quoting *Gilligan* v. *Morgan*, 413 U. S. 1, 10 (1973)) (emphasis in original).

Similarly, in *Bush* we dealt with the unique area of federal employment relations, where the Government acts not as governor but as employer. We observed that Congress had devoted a century to studying the problems peculiar to this subject, during the course of which it had "developed considerable familiarity with balancing governmental efficiency and the rights of employees." 462 U. S., at 389. In addition, Congress "has a special interest in informing itself about the efficiency and morale of the Executive Branch," and is far more capable than courts of apprising itself of such matters "through factfinding procedures such as hearings that are not available to the courts." *Ibid.* In declining to recognize a cause of action for constitutional violations that might arise in the civil service context, therefore, we reasoned that the recognition of such an action could upset Congress' careful structuring of federal employment relations, and concluded that "Congress is in a far better position to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service." *Ibid.*

Ignoring the unique characteristics of the military and civil service contexts that made judicial recognition of a *Bivens* action inappropriate in those cases, the Court today observes that "[c]ongressional competence at 'balancing governmental efficiency and the rights of [individuals]' is no more questionable in the social welfare context than it is in the civil service context." *Ante*, at 425 (quoting *Bush, supra*, at 389). This observation, however, avails the Court nothing, for in *Bush* we declined to create a *Bivens* action for aggrieved federal employees not because Congress is simply competent to legislate in the area of federal employment relations, but because Congress is far more capable of addressing the special problems that arise in those relations than are courts. Thus, I have no quarrel with the Court's assertion that in *Bush* we did not decline to create a *Bivens* action because we believed such an action would be more disruptive in the civil service context than elsewhere, but because we were "'convinced that Congress is in a better position to decide whether or not the public interest would be served by creating [such an action.]'" *Ante*, at 427 (quoting *Bush, supra*, at 390). That conviction, however, flowed not from mere congressional competence to legislate in the area of federal employment relations, but from our recognition that we lacked the special expertise Congress had developed in such matters, as well as the ability to evaluate the impact such a right of action would have on the civil service. See *Bush, supra*, at 389.

The Court's suggestion, therefore, that congressional authority over a given subject is itself a "special factor" that "counsel[s] hesitation [even] in the absence of affirmative action by Congress," see *Bivens*, 403 U. S., at 396, is clearly mistaken. In *Davis* v. *Passman*, 442 U. S. 228 (1979), we recognized a cause of action under the Fifth Amendment's Due Process Clause for a congressional employee who alleged that she had been discriminated against on the basis of her sex, even though Congress is competent to pass legislation governing the employment relations of its own Members, see

42 U. S. C. § 2000e–16(a) (excluding congressional employees from the coverage of § 717 of Title VII). Likewise, in *Carlson* v. *Green,* 446 U. S. 14 (1980), we created a *Bivens* action for redress of injuries flowing from the allegedly unconstitutional conduct of federal prison officials, notwithstanding the fact that Congress had expressly (and competently) provided a statutory remedy in the Federal Tort Claims Act for injuries inflicted by such officials. In neither case was it necessary to inquire into Congress' competence over the subject matter. Rather, we permitted the claims because they arose in areas in which congressional competence is no greater than that of the courts, and in which, therefore, courts need not fear to tread even in the absence of congressional action.

The same is true here. Congress, of course, created the disability insurance program and obviously may legislate with respect to it. But unlike the military setting, where Congress' authority is plenary and entitled to considerable judicial deference, or the federal employment context, where Congress enjoys special expertise, social welfare is hardly an area in which the courts are largely incompetent to act. The disability insurance program is concededly large, but it does not involve necessarily unique relationships like those between enlisted military personnel and their superior officers, or Government workers and their federal employers. Rather, like the federal law enforcement and penal systems that gave rise to the constitutional claims in *Bivens* and *Carlson, supra,* the constitutional issues that surface in the social welfare system turn on the relationship of the Government and those it governs—the relationship that lies at the heart of constitutional adjudication. Moreover, courts do not lack familiarity or expertise in determining what the dictates of the Due Process Clause are. In short, the social welfare context does not give rise to the types of concerns that make it an area where courts should refrain from creat-

ing a damages action even in the absence of congressional action.

## III

Because I do not agree that the scope and design of Title II's administrative review process is a "special factor" precluding recognition of a *Bivens* action, I turn to petitioners' remaining arguments as to why we should not recognize such an action here.

## A

Petitioners contend that Congress has explicitly precluded the creation of a *Bivens* remedy in Title II itself. Section 405(h) provides:

> "The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under [Title II]." 42 U. S. C. § 405(h) (1982 ed., Supp. IV).

The only provision in Title II for judicial review of the Secretary's decisions is set out in 42 U. S. C. § 405(g). Petitioners argue that because the second sentence of § 405(h) precludes review of any agency decision except as provided under § 405 (g), and that because the full remedy available following administrative or judicial review under the latter subsection is retroactive payment of any wrongfully terminated disability benefits, Congress has expressly precluded all other remedies for such wrongful terminations.

We just recently rejected this argument, explaining that "[t]he purpose of 'the first two sentences of § 405(h),' as we made clear in *Weinberger* v. *Salfi*, 422 U. S. 749, 757 (1975), is to 'assure that administrative exhaustion will be re-

quired.'" *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 679, n. 8 (1986). The exhaustion requirement, however, does not apply where "there is no hearing, and thus no administrative remedy, to exhaust." *Ibid.* As in *Michigan Academy*, respondents here do not contest any decision reached after a hearing to which they were parties, for those decisions resulted in the full restoration of their benefits. Instead, they seek review of allegedly unconstitutional conduct and decisions that preceded the initial termination of their benefits. Their constitutional challenge to such conduct, like the attack on the agency regulation in *Michigan Academy*, is simply not cognizable in the administrative process, and thus any limitations the exhaustion requirement might impose on remedies available through that process are inapplicable here. Cf. *Heckler* v. *Ringer*, 466 U. S. 602, 617 (1984) (where parties "have an adequate remedy in § 405(g) for challenging *all* aspects of the Secretary's *denial* of their claims . . . [,] § 405(g) is the only avenue for judicial review of [their] claims for *benefits*") (emphasis added). Moreover, § 405(g) itself says nothing whatever about remedies, but rather establishes a limitations period and defines the scope of review governing judicial challenges to final agency decisions. Had Congress set out remedies in § 405(g) and declared them exclusive, I might agree that we would be precluded from recognizing a *Bivens* action. But limitations on a specific remedy—judicial review of agency decisions after a hearing—do not in and of themselves amount to an express preclusion of other, unspecified, remedies such as *Bivens* actions.

Petitioners also contend that the final sentence of § 405(h) establishes another, independent bar to creation of a *Bivens* action. In isolation, the sentence might well suggest such a broad preclusion, for it bars resort to federal-question jurisdiction—the jurisdictional basis of *Bivens* actions—for recovery on any claims arising under Title II. The sentence, however, does not appear in isolation, but is rather part of a

subsection governing a discrete category of claims: those brought to findings of fact or final decisions of the Secretary after a hearing to which the claimant was a party. Read in context, therefore, the final sentence serves as an adjunct to the exhaustion requirement established in the first two sentences by channeling any and all challenges to benefits determinations through the administrative process and thereby forestalling attempts to circumvent that process under the guise of independent constitutional challenges. See *Heckler* v. *Ringer, supra,* at 615–616 (§ 405(h) barred federal-question jurisdiction over constitutional challenge to Secretary's refusal to provide reimbursement for certain medical procedures); *Weinberger* v. *Salfi, supra,* at 760–761 (§ 405(h) barred federal-question jurisdiction over constitutional challenge leveled at regulation that rendered claimant ineligible for benefits). Respondents here do not contest any benefits determination, nor have they attempted to bypass the administrative review process: rather, having exhausted the remedies that process provides, they now seek relief for constitutional injuries they suffered in the course of their benefits determinations which the administrative scheme left unredressed. In *Michigan Academy, supra,* we declined to conclude that the last sentence of § 405(h) "by its terms prevents any resort to the grant of federal-question jurisdiction contained in 28 U. S. C. § 1331," *id.,* at 679–680; because I do not believe that the sentence in question applies to claims such as these respondents assert, I conclude that Congress has not expressly precluded the *Bivens* remedy respondents seek.

B

Finally, petitioners argue that the sheer size of the disability insurance program is a special factor militating against recognition of a *Bivens* action for respondents' claims. SSA is "probably the largest adjudicative agency in the western world," *Heckler* v. *Campbell,* 461 U. S. 458, 461, n. 2 (1983) (internal quotations and citation omitted), responsible for

processing over 2 million disability claims each year. *Heckler* v. *Day*, 467 U. S. 104, 106 (1984). Accordingly, petitioners argue, recognition of a *Bivens* action for any due process violations that might occur in the course of this processing would have an intolerably disruptive impact on the administration of the disability insurance program. Thousands of such suits could potentially be brought, diverting energy and money from the goals of the program itself, discouraging public service in the agency, and deterring those officials brave enough to accept such employment from "legitimate efforts" to ensure that only those truly unable to work receive benefits. Brief for Petitioners 47.

Petitioners' dire predictions are overblown in several respects. To begin with, Congress' provision for interim payments in both the 1983 emergency legislation, see n. 3, *supra*, and the 1984 Reform Act dramatically reduced the number of recipients who suffered consequential damages as a result of initial unconstitutional benefits termination. Similarly, the various other corrective measures incorporated in the 1984 legislation, which petitioners champion here as a complete remedy for past wrongs, should forestall future constitutional deprivations. Moreover, in order to prevail in any *Bivens* action, recipients such as respondents must both prove a deliberate abuse of governmental power rather than mere negligence, see *Daniels* v. *Williams*, 474 U. S. 327 (1986), and overcome the defense of qualified immunity.[5] See *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). Indeed, these very requirements are designed to protect Government officials from liability for their "legitimate" actions; the prospect of liability for deliberate violations of known constitutional rights, therefore, will not dissuade well-intentioned civil servants either from accepting such employment or from carrying out the legitimate duties that employment imposes.

---

[5] Two of respondents' claims, those challenging the acceleration of the CDR program and the nonacquiescence in Ninth Circuit decisions, have already fallen to this defense. See *ante*, at 419.

Petitioners' argument, however, is more fundamentally flawed. Both the federal law enforcement system involved in *Bivens* and the federal prison system involved in *Carlson* v. *Green*, 446 U. S. 14 (1980), are vast undertakings, and the possibility that individuals who come in contact with these Government entities will consider themselves aggrieved by the misuse of official power is at least as great as that presented by the social welfare program involved here. Yet in neither case did we even hint that such factors might legitimately counsel against recognition of a remedy for those actually injured by the abuse of such authority. See *Bivens*, 403 U. S., at 410 (Harlan, J., concurring in judgment) ("I . . . cannot agree . . . that the possibility of 'frivolous' claims . . . warrants closing the courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits"). Indeed, in *Bivens* itself we rejected the suggestion that state law should govern the liability of federal officials charged with unconstitutional conduct precisely because officials "acting . . . in the name of the United States posses[s] a far greater capacity for harm than [a private] individual . . . exercising no authority other than his own." *Id.*, at 392. That the authority wielded by officials in this case may be used to harm an especially large number of innocent citizens, therefore, militates in *favor* of a cause of action, not against one, and petitioners' argument to the contrary perverts the entire purpose underlying our recognition of *Bivens* actions. In the modern welfare society in which we live, where many individuals such as respondents depend on government benefits for their sustenance, the Due Process Clause stands as an essential guarantee against arbitrary governmental action. The scope of any given welfare program is relevant to determining what process is due those dependent upon it, see *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976), but it can never free the administrators of that program from all constitutional restraints, and should likewise not excuse those administrators from liability when they

act in clear contravention of the Due Process Clause's commands.

## IV

After contributing to the disability insurance program throughout their working lives, respondents turned to it for essential support when disabling medical conditions prevented them from providing for themselves. If the allegations of their complaints are true, they were unjustly deprived of this essential support by state and federal officials acting beyond the bounds of their authority and in violation of respondents' constitutional rights. That respondents suffered grievous harm as a result of these actions—harm for which the belated restoration of disability benefits in no way compensated them—is undisputed and indisputable. Yet the Court today declares that respondents and others like them may recover nothing from the officials allegedly responsible for these injuries because Congress failed to include such a remedy among the reforms it enacted in an effort to rescue the disability insurance program from a paralyzing breakdown. Because I am convinced that Congress did not intend to preclude judicial recognition of a cause of action for such injuries, and because I believe there are no special factors militating against the creation of such a remedy here, I dissent.