PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3422
_____

ROGER VANDERKLOK

v.

UNITED STATES OF AMERICA;
TRANSPORTATION SECURITY ADMINISTRATION
(TSA);
CHARLES KIESER, TSA; CITY OF PHILADELPHIA;
RAYMOND PINKNEY, Philadelphia Police;
DETECTIVE M. WOJCIECHOWSKI, Philadelphia Police;
KENNETH FLAVILLE, Philadelphia Police;
JEH JOHNSON, Department of Homeland Security;
JOHN S. PISTOLE, TSA

Charles Kieser, TSA,
                                    Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-15-cv-00370)
District Judge:  Hon. Gerald J. Pappert
_____

ARGUED
March 23, 2017

Before: SMITH, *Chief Judge*, JORDAN, and ROTH, *Circuit Judges*.

(Filed: August 22, 2017)
_____

John C. Connell   [ARGUED]
Archer & Greiner
One Centennial Square
33 East Euclid Ave.
Haddonfield, NJ   08033

Jordan L. Fischer
Jeffrey M. Scott
Archer & Greiner
1650 Market St. – 32nd Fl.
Philadelphia, PA   19103
        *Counsel for Appellant*

Nicholas A. Cummins
Charity C. Hyde
Bennett Bricklin & Saltzburg
1601 Market St. – 16th Fl.
Philadelphia, PA   19103
        *Counsel for Defendants City of Philadelphia,*
        *Kenneth Flaville, Raymond Pinkney and*
        *Michael Wojciechowski*

Colin M. Cherico
Anne B. Taylor
Office of United States Attorney
615 Chestnut Street - #1250
Philadelphia, PA   19106
     *Counsel for Defendants United States of America,*
     *Transportation Security Administration,*
     *John S. Pistole and Jeh Johnson*

Robyn L. Goldenberg
50 Ross Way
Marlton, NJ   08053

Thomas B. Malone   [ARGUED]
The Malone Firm, LLC
1650 Arch St. – Ste. 2501
Philadelphia, PA   19103
     *Counsel for Appellee*

Bejamin C. Mizer
Paul J. Fishman
Daniel J. Aguilar   [ARGUED]
Sharon Swingle
Mary Hampton Mason
Andrea Jae Friedman
United States Dept. of Justice
Civil Division – Rm. 7266
950 Pennsylvania Avenue, N.W.
Washington, DC   20530
     *Counsel for Amicus Appellant*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Roger Vanderklok wanted to fly from Philadelphia to Miami, where he intended to run a half-marathon. In his carry-on luggage, he had a heart monitor and watch stored inside a piece of PVC pipe that was capped on both ends. During screening at the airport security checkpoint, the pipe and electronics prompted secondary screening, supervised by Transportation Security Administration (TSA) employee Charles Kieser. According to Vanderklok, Kieser was disrespectful and aggressive, so Vanderklok stated an intent to file a complaint against him. Vanderklok claims that Kieser, in retaliation, called the Philadelphia police and falsely reported that Vanderklok had threatened to bring a bomb to the airport. Based on Kieser's statement, Vanderklok was arrested. He was later acquitted of all criminal charges when Kieser's testimony about Vanderklok's behavior did not match airport surveillance footage. Vanderklok then brought this suit against Kieser and others, asserting numerous statutory and constitutional violations.

Kieser moved for summary judgment, arguing, among other things, that he was entitled to qualified immunity on Vanderklok's First Amendment claim and that Vanderklok had failed to make out a Fourth Amendment claim on the merits. The United States District Court for the Eastern District of Pennsylvania concluded that Kieser lacked qualified immunity as to Vanderklok's First Amendment claim and that a reasonable jury could find in Vanderklok's favor as to his Fourth Amendment claim. It therefore denied

4

the summary judgment motion. Kieser filed this interlocutory appeal.

Because Kieser sought and was denied summary judgment on the merits of Vanderklok's Fourth Amendment claim, rather than on the basis of qualified immunity, that claim cannot be reviewed on interlocutory appeal. By contrast, Kieser's appeal of the denial of qualified immunity as to Vanderklok's First Amendment claim is properly before us. As it turns out, however, a preliminary and dispositive question must be answered first: whether a First Amendment claim against a TSA employee for retaliatory prosecution even exists in the context of airport security screenings. Because we conclude that it does not, we will vacate the District Court's order, without reaching the issue of qualified immunity, and direct the District Court to enter judgment for Kieser on the First Amendment claim.

## I. BACKGROUND

### A. Factual Background[1]

In January 2013, Vanderklok, a gentleman in his late fifties, arrived at the Philadelphia International Airport, intending to travel to Miami to participate in a half-marathon. He entered the passenger screening area, where his carry-on bag was x-rayed by TSA personnel. The x-ray images

---

[1] In reviewing the District Court's denial of qualified immunity, we are required to take the facts in the light most favorable to Vanderklok. *Scott v. Harris*, 550 U.S. 372, 377 (2007).

revealing his heart monitor and watch, stored in a short length of PVC pipe, triggered secondary screening of his bag.

Vanderklok was directed to the secondary screening area, where TSA screeners manually examined his bag and its contents. At this point in the story, the parties' versions of events diverge dramatically. Kieser, a TSA supervisor and the last remaining defendant in this case, left his supervisory station and came to the secondary screening area to observe the line agent's examination of Vanderklok's bag. Vanderklok maintains that at all times he was patient and not agitated during the secondary screening but that Kieser was agitated and argumentative throughout. Kieser asserts essentially the opposite: that Vanderklok was belligerent during the secondary search. In Kieser's telling, Vanderklok said, "I could bring a bomb through here any day I want and you'll never find it." (JA 8.) Vanderklok denies making that or any similar statement. He says that Kieser fabricated the statement after Vanderklok asked for a complaint form and stated his intention to report Kieser's behavior. There were no other known witnesses to Vanderklok's alleged statement. Once the secondary screening was complete, Vanderklok's bag and all of its original contents, other than the PVC pipe, were returned. Vanderklok then exited the security checkpoint area and began to rearrange his bag.

As Vanderklok exited the screening area, Kieser called an airport police officer to report the statement Vanderklok allegedly made about a bomb. Officer Pinkney of the Philadelphia Police Department approached Vanderklok outside the screening area approximately five minutes after Vanderklok had requested the complaint form. Based on Kieser's claim that Vanderklok had made a bomb threat,

Pinkney and another officer took Vanderklok into custody, placing him in a holding cell at the airport police station. Detective Wojciechowski, also of the Philadelphia Police Department, was assigned to further investigate. He spoke with Kieser, who repeated that Vanderklok made a bomb threat and was "irate" and "loud" during the secondary screening.[2] (JA 311.) After a brief investigation, Wojciechowski recommended that Vanderklok be charged with disorderly conduct and threatening placement of a bomb. The District Attorney approved those charges and eventually added a third charge for making terroristic threats. Vanderklok was handcuffed and transported to a nearby police station where he was held until making a first appearance and posting bond.

Vanderklok was tried in the Philadelphia Court of Common Pleas on April 8, 2013. During that trial, the only witness produced by the Commonwealth was TSA agent Kieser. Kieser testified on direct examination that Vanderklok was agitated and waved his arms in the air repeatedly during the secondary screening. On cross examination, he further elaborated on his assertion that Vanderklok was physically disruptive at the checkpoint. Surveillance video of almost the entire interaction was played during the cross examination of Officer Pinkney and Kieser's testimony was shown to be largely inconsistent with the video. After the Commonwealth's case-in-chief, Vanderklok

---

[2] Detective Wojciechowski's investigative report shows that Officer Pinkney's original detention of Vanderklok and the formal charges against him were based entirely on Kieser's assertions.

7

made a motion for judgment of acquittal on all counts, which was granted.

## B. Procedural Background

Following his acquittal, Vanderklok brought suit in the District Court against Kieser, the United States, the TSA, the City of Philadelphia, and various police officers. In his Amended Complaint, Vanderklok asserted nine claims: (1) unconstitutional search and seizure in violation of the Fourth Amendment, under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*;[3] (2) unconstitutional infringement of the freedom of speech in violation of the First Amendment, under § 1983 and *Bivens*; (3) false arrest, under Pennsylvania law and the Federal Tort Claims Act ("FTCA"); (4) false imprisonment, under Pennsylvania law and the FTCA; (5) assault and battery, under Pennsylvania law and the FTCA; (6) constitutional deprivations by the City of Philadelphia, under *Monell v. Department of Social Services*;[4] (7) malicious prosecution in violation of the Fourth Amendment, under Pennsylvania law, the FTCA, and § 1983; (8) retaliatory prosecution in violation

---

[3] 403 U.S. 388, 392 (1971) (holding that a remedy is available for a federal agent's violation of a citizen's Fourth Amendment right to be free from warrantless searches and seizures).

[4] 436 U.S. 658, 694 (1978) (holding that a municipality is subject to suit under 42 U.S.C. § 1983 when a constitutional deprivation is the result of a policy or custom instituted by its policymakers).

8

of the Fourth Amendment, under Pennsylvania law, the FTCA, and § 1983; and (9) violations of due process rights, under the Fourteenth Amendment and the FTCA.

The police officers and the City of Philadelphia responded with a motion to dismiss. The District Court granted the motion as to the police officers, holding that they had probable cause to arrest Vanderklok and, even if they did not, they were protected by qualified immunity. *Vanderklok v. United States*, 140 F. Supp. 3d 373, 385 (E.D. Pa. 2015). Then, after dismissing the claims against the police officers, the Court held that, "[w]ithout an underlying constitutional violation, Vanderklok's *Monell* claim [against the City of Philadelphia] must similarly be dismissed." *Id.* at 387.

The claims under the FTCA, in addition to being brought against individual defendants, were asserted against the United States. The United States moved to substitute itself in place of those individual defendants and then moved to dismiss all claims against itself, citing sovereign immunity. *Vanderklok v. United States*, 142 F. Supp. 3d 356, 360 (E.D. Pa. 2015), *appeal dismissed* (Feb. 8, 2016). The District Court granted those motions, and therefore all of the state tort claims were dismissed. *Id.* at 358.

None of those rulings are before us now.[5] *Vanderklok v. United States*, No. CV 15-00370, 2015 WL 12844282, at

---

[5] Vanderklok moved under Federal Rule of Civil Procedure 54(b) to certify the orders of dismissal for appeal. That rule permits district courts to "direct entry of final judgment as to one or more, but fewer than all, claims or parties … if the court expressly determines that there is no

9

*2 (E.D. Pa. Dec. 4, 2015). Only Vanderklok's First Amendment retaliatory prosecution claim and his Fourth Amendment malicious prosecution claim are left, and only as to Kieser.[6] Kieser had moved for summary judgment on those claims too, but the District Court denied that motion. As to the First Amendment retaliatory prosecution claim, the Court first determined that such a cause of action does exist, relying on *Bivens*. It then concluded that Kieser was not entitled to qualified immunity from that claim. As to the Fourth Amendment malicious prosecution claim, the Court addressed the merits and determined that there was a material dispute of fact that precluded summary judgment.

This interlocutory appeal followed.

## II.   JURISDICTION

"[W]e normally do not entertain appeals from a district court order denying a motion for summary judgment because such orders do not put an end to the litigation." *Rivas v. City of Passaic*, 365 F.3d 181, 191 (3d Cir. 2004). But a special

---

just reason for delay." Fed. R. Civ. P. 54(b). The District Court denied certification. *Vanderklok v. United States*, No. CV 15-00370, 2015 WL 12844282, at *2 (E.D. Pa. Dec. 4, 2015).

[6] The District Court granted partial summary judgment to Kieser on Vanderklok's Fourth Amendment unconstitutional search and seizure claim because Vanderklok did not oppose Kieser's motion on that claim. *Vanderklok v. United States*, No. CV 15-00370, 2016 WL 4366976, at *1 (E.D. Pa. Aug. 16, 2016).

class of rulings called "collateral orders" escape that general practice. *Id.* We will hear interlocutory appeals from such orders because they "(i) conclusively determine the disputed issue, (ii) resolve an important issue entirely separate from the merits of the lawsuit, and (iii) cannot be effectively reviewed on appeal from a final judgment." *Id.*

Included within the classification of "collateral orders" is a denial of "a defendant's motion for summary judgment … so long as: (1) the defendant is a public official asserting a qualified immunity defense; and (2) the issue on appeal is whether the facts alleged by the plaintiff demonstrate a violation of clearly established federal law, not which facts the plaintiff might be able to prove at trial." *Id.* (emphasis removed) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)). Excepted from that classification is an order denying summary judgment that, "though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Id.* at 192 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). Here, the only properly appealable issues are the ones related to the District Court's denial of qualified immunity on Vanderklok's First Amendment claim.

The Court denied Kieser's motion for summary judgment on that claim after concluding that the law does provide for such a claim and that Kieser was not entitled to qualified immunity with respect to it. The qualified immunity dispute centers on whether a First Amendment right to be free from retaliation by a TSA employee was clearly established at the time of the incident in question. That is exactly the type of issue we have jurisdiction to review, because qualified immunity is immunity from suit altogether and thus "cannot

11

be effectively vindicated after the trial has occurred." *Mitchell*, 472 U.S. at 525. And since the issue of whether a cause of action even exists against a TSA employee for First Amendment retaliation is a threshold question of law, we have jurisdiction to consider that as well. *See Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007) (explaining that the existence of a cause of action is "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal" (quoting *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006))).

We do not, however, have jurisdiction over Kieser's appeal to the extent that it challenges the District Court's denial of summary judgment as to Vanderklok's Fourth Amendment malicious prosecution claim. Kieser attempts to add a jurisdictional hook to his Fourth Amendment challenge by arguing that, because there is no way for him to be liable on the present record, he "remains qualifiedly immune." (Opening Br. at 30.) More particularly, he argues that "[t]he District Court's denial of qualified immunity at the summary judgment stage fundamentally misapplied the premise that the existence of probable cause will not insulate a defendant from liability if that defendant can be shown to have fabricated the predicate for that probable cause." (*Id.* at 31.)

Whatever the merit of that argument, it ignores that Kieser did not seek a qualified immunity ruling from the District Court on the Fourth Amendment malicious prosecution claim, and thus the Court did not adjudicate the qualified immunity issue. Kieser instead argued in the District Court that there was a lack of sufficient admissible evidence to support that constitutional claim. A reading of the District Court's thorough opinion confirms that the Court

12

denied summary judgment based on material disputes of fact essential to the elements of Vanderklok's Fourth Amendment malicious prosecution claim, including that Kieser lacked probable cause. At no point in the Court's discussion of that claim did the issue of qualified immunity arise.

Kieser's failure to obtain a qualified immunity ruling from the District Court is not simply a waiver problem that we can overlook, as he seems to hope. The fact that he was denied summary judgment on the merits of that Fourth Amendment claim rather than on qualified immunity grounds deprives us of jurisdiction on interlocutory appeal, and we have no discretion to overlook that. His argument that we should consider qualified immunity on that claim because it serves judicial economy similarly fails. Judicial economy gives us no warrant to extend our jurisdiction past its set limits.[7]

In sum, our jurisdiction at this point extends only to the issue of whether Kieser ought to be immune from suit for Vanderklok's First Amendment retaliation claim, and,

---

[7] Even if Kieser had properly raised the issue of qualified immunity, we would still be without jurisdiction to review it because that issue would turn on the disputed facts of the case decided by the District Court. *See Rivas v. City of Passaic*, 365 F.3d 181, 191 (3d Cir. 2004) ("[W]e lack jurisdiction to consider whether the district court correctly identified the set of facts … sufficient to establish a violation of a clearly established constitutional right." (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 61 (3d Cir. 2002))).

13

preliminary to that, whether such a claim exists at all in the specific circumstances of this case.

## III.   DISCUSSION

### A.   The Expansion of *Bivens* Actions to New Contexts is Strictly Limited.

It may help at the outset to examine the development of implied rights of action, to establish the perspective we must take in evaluating Vanderklok's First Amendment retaliation claim.  The Supreme Court first implied a private right of action for damages for a deprivation of constitutional rights by federal officers in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).   Thus, such actions brought directly under the Constitution against federal officials have become known as "*Bivens* actions."   The authority of federal courts "to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases 'arising under the Constitution, laws, or treaties of the United States.'"   *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (quoting 28 U.S.C. § 1331).   It is, however, an authority rarely invoked.  In *Bivens* itself, the Supreme Court implied a private right of action under the Fourth Amendment.   403 U.S. at 389.   Since *Bivens*, such actions have been recognized under the Fifth Amendment's due process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1980). But, over the course of nearly four decades, the Supreme Court has repeatedly refused to recognize *Bivens* actions in any new contexts.  *Cf. Carlson*, 446 U.S. 14 (providing the

14

last set of novel circumstances in which the Court implied a *Bivens* action).

The Supreme Court has never implied a *Bivens* action under any clause of the First Amendment. *See Reichle v. Howards*, 566 U.S. 658 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). Instead, it has, solely for analytical purposes, assumed that such an action exists. It has not actually decided the matter. *See Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) ("[W]e have several times assumed without deciding that *Bivens* extends to First Amendment claims. We do so again in this case." (internal citation omitted)).

Our Court, on the other hand, has taken that step. First, in *Paton v. La Prade*, we held that a high school student who mailed an envelope to the Socialist Workers Party, and had her name and address recorded by the FBI as a result, could seek redress under *Bivens* for a violation of her First Amendment free speech rights. 524 F.2d 862, 870 (3d Cir. 1975). Then, in *Milhouse v. Carlson*, we extended *Paton* to imply a *Bivens* cause of action under the First Amendment for the denial of a prisoner's right of access to the courts. 652 F.2d 371, 374 (3d Cir. 1981). Recently, though, in *George v. Rehiel*, we took a more cautious approach and assumed without deciding that a *Bivens* action could exist to vindicate a First Amendment right to be free of government retaliation for speech. 738 F.3d 562, 585 n.24 (3d Cir. 2013) ("[W]e will proceed on the assumption that there is a *Bivens* cause of action for First Amendment retaliation claims."). We made that assumption, coincidentally, in the very context we now face – a dispute involving airport security screeners. *Id.* at 567-68.

The present case compels us to decide the issue we assumed away in *George*. The facts here require it. Moreover, as the role of the TSA has become prevalent in the lives of the traveling populace, disputes involving airport screening personnel may come up with some frequency, and the existence of a *Bivens* action for First Amendment retaliation is no longer something that we should assume without deciding. Today we hold that *Bivens* does not afford a remedy against airport security screeners who allegedly retaliate against a traveler who exercises First Amendment rights.

Our conclusion is informed by a long course of precedent. Since our decisions in *Paton* and *Milhouse* permitting *Bivens* actions in certain First Amendment contexts, the Supreme Court has plainly counseled against creating new *Bivens* causes of action.[8] The Court has explained that its recognition of a cause of action under a constitutional amendment does not mean that such an action can vindicate every violation of the rights afforded by that

---

[8] *See, e.g., Minneci v. Pollard*, 565 U.S. 118 (2012) (refusing to extend Eighth Amendment *Bivens* action to individuals working at a private prison); *FDIC v. Meyer*, 510 U.S. 471 (1994) (refusing to extend *Bivens* claim to federal agency defendant); *Schweiker v. Chilicky*, 487 U.S. 412 (1988) (refusing to extend *Bivens* to case involving wrongful denials of disability benefits); *United States v. Stanley*, 483 U.S. 669 (1987) (refusing to extend *Bivens* to case involving injuries suffered incident to military service); *Chappell v. Wallace*, 462 U.S. 296 (1983) (refusing to extend *Bivens* to case involving racial discrimination by superiors in military).

particular amendment.  *Compare Davis*, 442 U.S. at 243-44 (permitting *Bivens* action against Congressman for violation of Fifth Amendment due process rights) *with Schweiker v. Chilicky*, 487 U.S. 412, 428-29 (1988) (refusing to permit *Bivens* action in social security context for violation of Fifth Amendment due process rights).  The recognition of a cause of action is context-specific.  As the Supreme Court said only last month,

> [a] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017).

Our past pronouncements are thus not controlling in the specific circumstances now at issue.  It is not enough to argue, as Vanderklok does, that First Amendment retaliation claims have been permitted under *Bivens* before.  We must look at the issue anew in this particular context, airport security, and as it pertains to this particular category of defendants, TSA screeners.  *Malesko*, 534 U.S. at 68 ("[W]e have consistently refused to extend *Bivens* liability to any new context or new category of defendants.").

Since *Bivens* was decided, judicial attitudes about the creation of new causes of action have changed considerably. Courts will no longer imply rights and remedies as a matter of course, "no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision]." *Ziglar*, 137 S. Ct. at 1856 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)); *see also Ziglar*, 137 S. Ct. at 1869 (Thomas, J. concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action." (internal quotations omitted)). "Given the notable change in the [Supreme] Court's approach to recognizing implied causes of action … the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 137 S. Ct. at 1848 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). So, for decades, the Supreme Court has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses. *See, e.g., Wilkie*, 551 U.S. 537 (refusing to extend *Bivens* to invasion of property rights); *Malesko*, 534 U.S. 61 (refusing to extend *Bivens* to alleged Eighth Amendment violations by employees of private prisons); *Bush v. Lucas*, 462 U.S. 267, 390 (1983) (refusing to imply a First Amendment *Bivens* action against a federal employer). Instead, it has established a rigorous inquiry that must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants. *Wilkie*, 551 U.S. at 550.

In accordance with that inquiry, as laid out in *Wilkie v. Robbins*, we must first ask "whether any alternative, existing

process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* Then, "even in the absence of an alternative, … '[we] must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed … to any special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Id.* (quoting *Bush*, 462 U.S. at 378). We turn to those questions next.

### B. No Alternative Process May Have Been Available.

At the first step in the *Wilkie* analysis, we ask whether there is any "'alternative, existing process' capable of protecting the constitutional interests at stake." *Minneci v. Pollard*, 565 U.S. 118, 125 (2012) (quoting *Wilkie*, 551 U.S. at 550). Here, Vanderklok's constitutional interest is in exercising his right to free speech at an airport security checkpoint without retaliation by a TSA screener. Vanderklok attempted to vindicate that constitutional interest by bringing state law and constitutional claims against both Kieser and the United States. He asserted in his Amended Complaint that his state law claims could be brought against Kieser individually and against the United States under the FTCA's waiver of sovereign immunity. But the District Court held that the United States could substitute itself in place of Kieser as a defendant. The Court then dismissed all claims against the United States, including those for which the United States had substituted itself in place of Kieser. Although those rulings are not before us, we take note of them as we determine whether remedies exist as an alternative to a *Bivens* claim.

19

The United States can generally be substituted for federal employees facing liability for state law tort claims when they "are sued for damages for harms caused in the course of their employment[.]" *Hui v. Castaneda*, 559 U.S. 799, 801 (2010) (citing 28 U.S.C. §§ 1346, 2671-2680). Once the United States substitutes itself for an individual defendant, the district courts only have jurisdiction to hear those claims if the United States has explicitly waived its sovereign immunity. If it has, then it can be held liable under the FTCA for the acts or omissions of federal employees, but only if it would otherwise be liable under "the law of *respondeat superior* of the state in which the act or omission occurred." *Lomando v. United States*, 667 F.3d 363, 373 (3d Cir. 2011) (quoting *McSwain v. United States*, 422 F.2d 1086, 1087-88 (3d Cir. 1970) (further citation omitted)).

If the United States is sued in tort, or once the United States substitutes itself as a defendant in a tort case, the FTCA provides the exclusive avenue to relief, if any can be had. *See* 28 U.S.C. § 2679(b)(1) ("The remedy against the United States provided by sections 1346(b) and 2672 of this title … is exclusive of any other civil action or proceeding for money damages[.]"). The remedies available are either an administrative settlement, as allowed by 28 U.S.C. § 2672,[9]

---

[9] 28 U.S.C. § 2672 provides, in relevant part, that: The head of each Federal agency or his designee, in accordance with regulations prescribed by the Attorney General, may consider, ascertain, adjust, determine, compromise, and settle any claim for money damages against the United States for injury or

or traditional tort damages, as afforded under 28 U.S.C. § 1346(b).[10] There are two types of claims that are exempt from the general rule that the FTCA provides the exclusive means for relief: first, claims that are "brought for a violation of the Constitution of the United States," and second, claims that are "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(A) and (B). Since, at this point in the analysis, we are considering whether any *alternatives* to a *Bivens* action are available to

loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred

[10] 28 U.S.C. § 1346(b) provides, in relevant part, that: [T]he district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, … for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

21

remedy a constitutional violation, the first exemption does not advance our inquiry, as it simply notes that a *Bivens* action itself is available. And because there is no explicit statutory violation at issue here, the second exception also provides no alternative remedy. Vanderklok thus has only his state law claims as a possible alternative to a *Bivens* action. But there is no waiver of immunity for state law claims brought against a government employee "acting within the scope of his office or employment[,]" except to the extent specified in the FTCA. *Id.* § 2679(b)(1). That leaves Vanderklok to proceed with his state law claims against the government under either § 2672 or § 1346(b).[11]

Under § 2672, an agency is authorized to settle with claimants for money damages up to $25,000, or higher if approval from the Attorney General is obtained. Here, Vanderklok did not obtain such a remedy.[12] Therefore, he is left with whatever relief may exist under § 1346(b). As noted earlier, *see* supra n.10, § 1346(b) provides that the district courts "shall have exclusive jurisdiction of civil actions on

---

[11] Section 1346(a) is inapplicable as it relates to "the recovery of … internal-revenue tax[.]"

[12] The record is unclear as to whether or not Vanderklok sought such an administrative settlement. If he did, no mention is made of it. We may presume that he did, however, since failure to pursue that administrative remedy would likely be grounds for dismissal in itself. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").

22

claims against the United States, for money damages … caused by the negligent or wrongful act or omission of any employee of the [g]overnment while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b). That section further provides that the government is liable for such damages "under circumstances where [it], if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission or occurred." *Id.*

Even when the government can be sued under § 1346(b), however, there are exceptions contained within § 2680 that preclude the application of § 1346(b) to certain tort claims. The exceptions laid out in § 2680 include a disclaimer of liability for the United States for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). That is known as the "intentional tort exception," *Millbrook v. United States*, 133 S. Ct. 1441, 1443 (2013) (quotation omitted), and Vanderklok's state law tort claims – false arrest, false imprisonment, battery, assault, retaliatory prosecution,[13] and

---

[13] It might be asked whether Vanderklok's "PA State Retaliatory Prosecution" claim falls within that exception. In our view, it does. The Supreme Court has likened a retaliatory prosecution claim to the common law analogs of malicious prosecution and abuse of process, *Hartman* 547 U.S. at 258 ("[W]e could debate whether the closer common-law analog to retaliatory prosecution is malicious prosecution (with its no-probable-cause element) or abuse of process (without it)."), both of which are included explicitly within the statute. In addition, we have interpreted the "arising

23

malicious prosecution – fall within that exception to the waiver of immunity. So it would appear that Vanderklok is out of luck under the FTCA.

But, in an added bit of complication, claims that fall within the intentional tort exception in that statute have another chance at survival because there is an exception to the exception that can bring them back within the waiver of sovereign immunity. Section 2680(h) creates that second-level exception "with regard to acts or omissions of investigative or law enforcement officers of the United States Government," for any claim arising "out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." That is known as the "law enforcement proviso." *Millbrook*, 133 S. Ct. at 1444. The FTCA defines an "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

Here, the District Court concluded that Kieser was not an investigative or law enforcement agent because he was not an "officer" of the United States under that definition. *Vanderklok*, 142 F. Supp. 3d at 361. In reaching that

under" language of the intentional tort exception broadly. *See Beneficial Consumer Disc. Co. v. Poltonowicz*, 47 F.3d 91, 96-97 (3d Cir. 1995) (holding that a fraud claim falls within the intentional torts of "misrepresentation" and "deceit" listed in the exception). Therefore, although not explicitly enumerated in the statute, retaliatory prosecution also falls within the intentional tort exception.

conclusion, the District Court first noted that, in other sections of the FTCA, Congress chose to use the term "federal employee" rather than "officer of the United States." *Id.* It therefore sought to determine when a TSA employee becomes an officer of the United States. The Court found its answer in the Aviation and Transportation Security Act, which created the TSA and designates as "law enforcement personnel" only those TSA agents who are "(1) authorized to carry and use firearms; (2) vested with the degree of the police power …; and (3) identifiable by appropriate indicia of authority." 49 U.S.C. § 44903(a)(1)-(3). Based on that, the District Court concluded that Kieser was a "federal employee[], who conduct[s] airport security screening;" not a "law enforcement officer[], who perform[s] various law enforcement functions."[14] *Id.* Therefore, it held that the United States retained its sovereign immunity and that the state law claims had to be dismissed for lack of jurisdiction. *Vanderklok*, 142 F. Supp. 3d at 362. The District Court's decision about the applicability of the law enforcement proviso is not on appeal at this time, *Vanderklok*, 2015 WL 12844282, at *2 (denying certification of an interlocutory appeal under Rule 54(b)), but the existence of that proviso is nevertheless important because it assures that, in cases where a TSA agent has been entrusted with the greater responsibilities of an investigative or law enforcement officer, a tort action will lie.

---

[14] As further support for that conclusion, the District Court relied on our statement in *Matsko v. United States*, that "employees of administrative agencies, no matter what investigative conduct they are involved in, do not come within the [law enforcement] exception." 372 F.3d 556, 560 (3d Cir. 2004).

25

In addition to the remedy that exists by virtue of the law enforcement proviso, we note that the United States would not be permitted to substitute itself as a defendant in the first place in cases where a government employee acted outside the scope of his duties. 28 U.S.C. § 2679(d). In determining whether an employee was acting within or outside of the scope of his duties, we look to the law of the state in which the action took place. *CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008), *as amended* (Sept. 29, 2008). In this case, that is Pennsylvania law, which incorporates the Second Restatement of Agency's definition of conduct within the scope of employment. *Id.* "According to the Restatement, 'conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master[.]'" *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quoting Restatement (Second) Agency § 228) (alterations in *Brumfield*).

Whether it was proper to allow the substitution of the United States as the defendant in this suit, in place of Kieser, for Vanderklok's state law claims is a question not now before us.[15] We nevertheless note that, in extreme cases, the

---

[15] It would be particularly difficult to review whether Kieser was acting within the scope of his employment when he took the actions in this case, since that District Court did not address that issue before substituting and dismissing the claims against the United States. *Vanderklok v. United States*, 142 F. Supp. 3d 356, 362 (E.D. Pa. 2015), *appeal*

26

United States would likely not be substituted as a defendant and thus claims against an egregiously erring government employee could not be dismissed on sovereign immunity grounds. *See Melo v. Hafer*, 912 F.2d 628, 639-42 (3d Cir. 1990) (allowing district courts to review whether defendant was acting within scope of employment before permitting substitution of United States and dismissal on sovereign immunity grounds) *aff'd Hafer v. Melo*, 502 U.S. 21 (1991) (affirming on other grounds, without addressing issue of substitution). Instead, we expect that in such cases the employee will not have acted within the scope of employment and therefore will face individual liability under state law. *See Matsko v. United States*, 372 F.3d 556, 558 n.5 (3d Cir. 2004) (dismissing FTCA claims against United States for lack of jurisdiction where employee acted outside scope of employment while recognizing that a state law claim would proceed in state court). So, although in such cases the United States would retain its sovereign immunity, state law tort claims against the individual could proceed. That would provide an alternative remedy for an airline passenger who suffers as a result of a TSA screener's actionable conduct outside the scope of his employment. In instances where the TSA screener has acted within the scope of his employment, it is possible that no judicial remedy will exist if a *Bivens* action is not implied because the United States could substitute itself for the screener and claim sovereign immunity. But that is by design. *Cf. United States v. Smith*, 499 U.S. 160, 166 (1991) ("Congress recognized that the required substitution of the United States as the defendant in

---

*dismissed* (Feb. 8, 2016). As a result, even if it were proper to consider the issue, there would be no record on which to do so at this time.

27

tort suits filed against Government employees would sometimes foreclose a tort plaintiff's recovery altogether.").

In summary, then, there can be a remedy against the United States in cases where the employee had the responsibility of an officer, and there can be a state law remedy against the individual when the offending TSA employee acted outside the scope of employment. Based on the District Court's orders as they now stand, however, there are no alternative judicial remedies available to Vanderklok, because the District Court concluded that Kieser was not an investigative or law enforcement officer and there was no challenge as to whether Kieser acted within the scope of his employment.

While an alternative judicial remedy is absent, there may be a non-judicial "alternative, existing process[.]" *Minneci*, 565 U.S. at 125 (quoting *Wilkie*, 551 U.S. at 550). In 2007, Congress enacted a statute requiring the Secretary of Homeland Security to "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat … by the [TSA.]" 49 U.S.C. § 44926(a). Pursuant to that statutory requirement, the Department of Homeland Security established the Traveler Redress Inquiry Program ("TRIP"), which is administered by the TSA and "is essentially a clearinghouse for traveler grievances." *Latif v. Holder*, 686 F.3d 1122, 1125 (9th Cir. 2012). In practice, it appears that TRIP is primarily used as a method by which individuals can challenge their inclusion on the "No-Fly List" that is part of the government's "Terrorist Screening Database." *See* Dept. of Homeland Sec. Office of Inspector Gen., Effectiveness of the Dept. of Homeland Sec.

Traveler Redress Program 35 (2009), https://www.oig.dhs.gov/assets/Mgmt/OIG-09-103r_Sep09.pdf, ("Most TRIP redress requests stem from watch list misidentifications in commercial aviation security settings.").[16] Yet, by its terms, TRIP appears to provide an administrative mechanism by which Vanderklok could have chosen to pursue his complaint against Kieser because he was "delayed or prohibited from boarding a commercial aircraft because [he was] wrongly identified as a threat[.]"[17] 49 U.S.C. § 44926(a).

The TRIP website supports that understanding, stating that a person can use TRIP if they "were denied or delayed boarding" or believe they "were unfairly detained during [their] travel experience[.]" Dept. of Homeland Sec., Should I Use DHS TRIP?, https://www.dhs.gov/step-1-should-i-use-

---

[16] Although neither Vanderklok nor Kieser addressed the existence of this administrative scheme as an alternative, the government as amicus curiae brought it to our attention. To the extent that we rely on information beyond what the government included in its amicus brief, that information is publicly available on government websites and therefore we take judicial notice of it. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("It is appropriate to take judicial notice of … information … made publicly available by government entities[.]").

[17] Since neither Vanderklok nor Kieser addressed the existence of this administrative mechanism, we do not know whether Vanderklok attempted to avail himself of it. If he knew of TRIP and chose not to avail himself of it, we do not have any explanation for that decision.

dhs-trip (last visited July 13, 2017). Vanderklok was indisputably denied boarding because of a purported threat, and that alone appears sufficient to file a TRIP complaint. He also believes he was detained unfairly. The online complaint form, by its terms, permits passengers to submit complaints if they feel their "civil rights have been violated because [the] questioning or treatment during screening was abusive or coercive[.]" Dept. of Homeland Sec. Traveler Redress Inquiry Program, https://trip.dhs.gov (last visited July 13, 2017). Therefore, it seems plain that an alternative administrative process exists for addressing claims such as Vanderklok's. Nonetheless, because the TRIP process appears to be used primarily as a means to challenge inclusion on terrorism watch lists, we will assume for the sake of discussion that it was not a meaningful remedy for Vanderklok in this case.

### C. There Are Special Factors Counseling Hesitation.

Although it is possible that no alternative remedy exists for Vanderklok, that does not conclude our analysis because, "even in the absence of an alternative, a *Bivens* remedy is a subject of judgment[.]" *Wilkie*, 551 U.S. at 550; *see also Meshal v. Higgenbotham*, 804 F.3d 417, 425 (D.C. Cir. 2015) (refusing to imply a *Bivens* remedy, even where the government admitted the plaintiff had no alternative remedy). In determining whether to imply a *Bivens* claim for First Amendment retaliation by TSA screeners, we must ask whether there are special factors counseling hesitation. *Id.* We conclude that there are and that they are dispositive.

30

Considering whether there are such factors, requires us to "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Wilkie*, 551 U.S. at 554. The critical question is "'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Ziglar*, 137 S. Ct. at 1857 (quoting *Bush*, 462 U.S. at 380). Most often, the answer is Congress. *Id*. Because, "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (internal quotations and citations omitted). The government, as amicus, argues that that is the correct answer in this instance, pointing to the serious risks at stake in the context of airport security and the superior position Congress has in weighing those risks and deciding upon their management.

The TSA was created in response to the terrorist attacks of September 11, 2001, specifically for the purpose of securing our nation's airports and air traffic. *Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 473 (D.C. Cir. 2007) (citing Pub L. No. 107-71, 115 Stat. 597 (2001) (codified in part at 49 U.S.C. § 44936 *et seq.*)). A special factor counseling hesitation in implying a *Bivens* action here is that Vanderklok's claims can be seen as implicating "the Government's whole response to the September 11 attacks, thus of necessity requiring an inquiry into sensitive issues of national security." *Ziglar*, 137 S. Ct. at 1861.

"The Supreme Court has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence." *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir.

31

2012). To the contrary, it has recognized that "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). In recognition of that, national security decisions, insofar as they relate to foreign relations[18] and the military,[19] have, to a large extent, been

---

[18] "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). That does not exclude from judicial review all cases touching on issues of foreign relations, but it does exclude those that are not susceptible to judicial determination in "light of [the] nature and posture [of the foreign relations question] in the specific case, and of the possible consequences of judicial action." *Baker v. Carr*, 369 U.S. 186, 211-12 (1962).

[19] In *Feres v. United States*, the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. 135, 146 (1950). "[T]he *Feres* doctrine has been applied consistently to bar all suits on behalf of service members against the Government based upon service-related injuries." *United States v. Johnson*, 481 U.S. 681, 687-88 (1987). In addition, "[t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," and therefore challenges to those judgments are nonjusticiable. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973);

insulated from judicial review. And our sister circuits have relied on the hesitancy of the Supreme Court to intrude on national security matters in refusing to imply *Bivens* actions.[20] Although there is no doctrine depriving us of jurisdiction, the

---

*see also Harris v. Kellog Brown & Root Servs., Inc.*, 724 F.3d 458, 478 (3d Cir. 2013) (explaining that whether an issue is justiciable "turns on whether a strategic military decision must be reviewed").

[20] *See, e.g. Meshal v. Higgenbotham*, 804 F.3d 417, 426 (D.C. Cir. 2015) ("Matters touching on national security and foreign policy fall within an area of executive action where courts hesitate to intrude absent congressional authorization."); *Mirmehdi v. United States*, 689 F.3d 975, 982-83 (9th Cir. 2012) (refusing to extend *Bivens* to immigration issues because such issues tend to affect foreign policy and national security); *Vance v. Rumsfeld*, 701 F.3d 193, 200 (7th Cir. 2012) (en banc) (refusing to extend *Bivens* against Secretary of Defense for mistreatment of military detainees abroad because, although it would "lead the Secretary to hold the rights of detainees in higher regard[,] … that change would come at an uncertain cost in national security"); *Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) (refusing to extend *Bivens* to the detention and transfer of an individual to Syria because it touches upon national security and thus "fall[s] within 'an area of executive action in which courts have long been *hesitant* to intrude' absent congressional authorization." (emphasis in *Arar*) (quoting *Lincoln v. Vigil*, 508 U.S. 182 (1993) (further quotations omitted)); *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (concluding political question doctrine did not bar review, but that *Bivens* should not extend to a national security context).

reluctance of the Supreme Court to weigh in on issues of national security strongly suggests that we too should hesitate to create a remedy when those issues are in play. *See Dept. of Navy v. Egan*, 484 U.S. 518, 527 (1988) (explaining that the presumption in favor of appellate review "runs aground when it encounters concerns of national security"); *cf. Bush*, 462 U.S. at 379-80 (recognizing that the Supreme Court has generally been hesitant to imply a damages remedy not explicitly provided by Congress where such a remedy would interfere with other branches of government (citing *United States v. Standard Oil Co.*, 332 U.S. 301 (1947), and *United States v. Gilman*, 347 U.S. 507 (1954))).

The hesitancy to imply a *Bivens* remedy in a case with national security implications must be particularly "pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief." *Ziglar*, 137 S. Ct. at 1861. That is because "[n]ational-security policy is the prerogative of the Congress and President[,]" and imposing damages liability would likely interfere with that prerogative by "caus[ing] an official to second-guess difficult but necessary decisions concerning national-security policy." *Id.*

Here, Vanderklok asks us to imply a *Bivens* action for damages against a TSA agent. TSA employees like Kieser are tasked with assisting in a critical aspect of national security – securing our nation's airports and air traffic. The threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers. In light of

34

Supreme Court precedent, past and very recent, that is surely a special factor that gives us pause.[21]

In addition to that, we must recognize that "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (quoting *Bush*, 462 U.S. at 389). "And Congress can tailor any remedy to the problem perceived[.]" *Id.* (citing *Bush*, 462 U.S. at 389). That is especially compelling here, as Congress chose to limit the scope of judicial review of TSA actions. In creating the

---

[21] In *Ziglar v. Abbasi*, decided last month, detainees held in the wake of the September 11, 2001 terrorist attacks brought suit against federal officials and wardens of their detention facility, claiming that they were abused and subjected to excessive detention in violation of the Fifth Amendment. 137 S. Ct. 1843 (2017). The Supreme Court recognized that it had previously implied a *Bivens* action under the Fifth Amendment and for vindication of prisoners' rights under the Eighth Amendment, but concluded that the case presented a new context because it differed from previous *Bivens* cases in a meaningful way. *Id.* at 1859. Ultimately, the Court noted that "[n]ational-security policy is the prerogative of the Congress and President[,]" *id.* at 1861, and that "Congress' failure to provide a damages remedy might be more than mere oversight." *Id.* at 1862. Therefore, in part to preserve the separation of powers, it refused to imply a *Bivens* remedy and instead left the matter to Congress. *Id.* at 1861-63. We have had the advantage of seeing this most recent pronouncement of the Supreme Court, but the District Court did not.

TSA, Congress restricted judicial review to affirming, amending, modifying, or setting aside orders of the agency. 49 U.S.C. § 46110(c). When courts do review such orders, the findings of fact made by the TSA are conclusive, if supported by substantial evidence. 49 U.S.C. § 46110(c); *Ickes v. F.A.A.*, 299 F.3d 260, 264 (3d Cir. 2002).[22]

Furthermore, we cannot ignore that remedies in the airport security context are circumscribed as a direct result of

---

[22] Another reason to believe that Congress may have thought about whether to permit suits against TSA employees and chose not to do so is because it decided to insulate from review personnel decisions regarding those employees. Congress has granted the Under Secretary of Transportation for Security full discretion to "employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary." 49 U.S.C. § 44935 note, Pub. L. 107-71, title I, §111(d), 115 Stat. 620 (2001), *as amended by* Pub. L. 112-171, § 1(a), 126 Stat. 1306 (2012). Courts have decided that the discretion thus granted precludes judicial review of personnel decisions regarding security screeners, those matters being left entirely to the Administrator of the TSA. *See Conyers v. Rossides*, 558 F.3d 137, 144-45 (2d Cir. 2009) (joining every other court that has decided the issue in concluding that judicial review of personnel decisions is foreclosed). Therefore, although our review in this case is not expressly limited, Congressionally-enacted restrictions on judicial review further counsel against creating a damages remedy against TSA security screeners.

Congressional decisions. *See Ziglar*, 137 S. Ct. at 1862 ("Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent.'" (quoting *Schweiker*, 487 U.S. at 423)). Congress decided the scope of tort liability for the government and government employees and Congress allowed the creation of an administrative mechanism by which to adjudicate certain TSA complaints. *See Bush*, 462 U.S. at 388 (refusing to discount an administrative scheme simply because it did not provide complete relief to the plaintiff). We should hesitate to create new remedies when it appears that the available ones are limited by Congressional design.

Finally, there is a practical concern with establishing a court-crafted remedy in the circumstances presented here. TSA employees typically are not law enforcement officers and do not act as such. As previously discussed, only those TSA employees specifically designated by the Under Secretary with the responsibilities of an officer, in accordance with 49 U.S.C. § 44903(a), operate like police officers. As a result, line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers. *See* 49 C.F.R. § 1542.213 (delineating mandatory training). Instead, they are instructed to carry out administrative searches and contact local law enforcement if they encounter situations requiring action beyond their limited though important responsibilities. *Cf.* 49 C.F.R. § 1542.215 (providing for "[u]niformed law enforcement personnel in the number and manner adequate to support" passenger screenings). Since a First Amendment retaliatory prosecution claim hinges, in part, on whether the allegedly offending government

employee had probable cause to take some enforcement action, *Hartman*, 547 U.S. at 259-66, a *Bivens* claim is poorly suited to address wrongs by line TSA employees. Indeed, the inherent uncertainty surrounding the probable cause standard is itself a factor counseling hesitation. *See Ziglar*, 137 S. Ct. 1864-65 (distinguishing the case from *Carlson*, in part, because the constitutional standard was unclear, thus affording less judicial guidance for defendants).

Ultimately, the role of the TSA in securing public safety is so significant that we ought not create a damages remedy in this context. The dangers associated with aircraft security are real and of high consequence. *Cf. Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (refusing to imply a *Bivens* action where "the need for unhesitating and decisive action … would be undermined by a judicially created remedy"). We, of course, do not suggest that TSA screeners should act with disdain for passenger rights or that they can escape all the consequences of their bad behavior. Discipline by the government should be swift and certain, when its employees' actions warrant it. But, when it comes to creating judicial remedies, there must be a balancing of priorities, and "[t]he proper balance is one for the Congress, not the Judiciary, to undertake." *Ziglar*, 137 S. Ct. at 1863. Otherwise, in this context, there is reason to "fear that a general *Bivens* cure would be worse than the disease." *Wilkie*, 551. U.S. at 561. Accordingly, in the specific context of airport security screeners, special factors preclude us from implying a *Bivens* cause of action for First Amendment retaliation.

38

## IV.  CONCLUSION

For the foregoing reasons, we will reverse in part and remand to the District Court with an instruction to enter judgment for Kaiser on the First Amendment retaliation claim, and will decline to exercise jurisdiction over the remainder of the appeal.