HAYNES, Circuit Judge, concurring:
I concur in the judgment and with the majority opinion's conclusion that Bivens should not extend to the circumstances of this case. I write separately to note that when we previously heard this case en banc, it was consolidated with two other appeals, which alleged issues arising under the Alien Tort Statute and Federal Tort Claims Act. See Hernandez v. United States, 785 F.3d 117, 139 (5th Cir. 2015) (Haynes, J., concurring). Those appeals and claims are not before us today, and they need not be addressed to resolve the Bivens claim against Mesa.
EDWARD C. PRADO, Circuit Judge, joined by GRAVES, Circuit Judge, dissenting:
Today's en banc majority denies Sergio Hernandez's parents a Bivens remedy for the loss of their son at the hands of a United States Border Patrol agent. The majority asserts that the transnational nature of this case presents a new context under Bivens and that special factors counsel against this Court's interference. While I agree that this case presents a new context, I would find that no special factors counsel hesitation in recognizing a Bivens remedy because this case centers on an individual federal officer acting in his law enforcement capacity. I respectfully dissent.
I do not take issue with the majority's framework for analyzing whether there are special factors counseling hesitation. "[S]eparation-of-powers principles are or should be central to the analysis." Ziglar v. Abbasi , --- U.S. ----, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017). And the majority's analysis purports to consider these principles by appropriately asking *825 "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." See ids="12604999" index="149" url="https://cite.case.law/s-ct/137/1843/">id. at 1857-58. However, in conducting this analysis, the majority is quickly led astray from the familiar circumstances of this case by empty labels of national security, foreign affairs, and extraterritoriality. These labels-as we say in Texas-are all hat, no cattle.
The majority repeatedly attempts to frame this case around the issue of whether aliens injured abroad can pursue Bivens remedies. That characterization, however, overlooks the critical who, what, where, when, and how of the lead actor in this tragic narrative. This case involves one federal officer "engaged in his law enforcement duties" in the United States who shot and killed an unarmed, fifteen-year-old Mexican boy standing a few feet away. The Supreme Court in Abbasi went to great lengths to indicate support for the availability of a Bivens remedy in exactly the circumstances presented here: an instance of individual law enforcement overreach. As the Court recently reaffirmed in no uncertain terms, Bivens is "settled law ... in [the] common and recurrent sphere of law enforcement." Abbasi , 137 S.Ct. at 1857. For the following reasons, I would retain Bivens in that common sphere and recognize a remedy for this senseless and arbitrary cross-border shooting at the hands of a federal law enforcement officer.[1]
The Supreme Court directed this Court "to consider how the reasoning and analysis in Abbasi may bear on this case," so that is where I begin. See Hernandez v. Mesa , --- U.S. ----, 137 S.Ct. 2003, 2006, 198 L.Ed.2d 625 (2017). In Abbasi , aliens detained for immigration violations following the September 11 attacks brought a class action suit against high-level federal executive officials and detention facility wardens. 137 S.Ct. at 1852-54. The detainees alleged that they had been detained in harsh conditions, including that they were confined in tiny cells for over 23 hours a day, subjected to regular strip searches, denied basic hygiene products and most forms of communication, and subjected to regular verbal and physical abuse by guards. Id. at 1853. Detainee-plaintiffs brought their Bivens claims alleging that the detention and policies authorizing it violated their Fourth and Fifth Amendment rights. Id. at 1853-54. After finding the case presented a new Bivens context because it challenged "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack"-a far cry from the three Bivens cases the Court had approved in the past-the Court determined that several special factors counseled hesitation that precluded a Bivens remedy against the executive officials. See id. at 1860-63.
The Supreme Court's analysis of four special factors in Abbasi is particularly relevant given the vastly different circumstances presented in this case. First, the *826 Court took issue with the fact that the detainees sought to hold high-level federal executive officials liable for the unconstitutional activity of their subordinates. See Abbasi , 137 S.Ct. at 1860. The Court warned that " Bivens is not designed to hold officers responsible for the acts of their subordinates." Id. (citing Ashcroft v. Iqbal , 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). Because "[t]he purpose of Bivens is to deter the officer ," a Bivens claim should be "brought against the individual official for his or her own acts, not the acts of others." Id. (quoting F.D.I.C. v. Meyer , 510 U.S. 471, 485, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ). Relatedly, the Abbasi Court found it problematic that that the detainees challenged a broad governmental policy, specifically the government's response to the September 11 attacks. Id. at 1860-61. The Court noted that "a Bivens action is not 'a proper vehicle for altering an entity's policy.' " Id. at 1860 (quoting Corr. Servs. Corp. v. Malesko , 534 U.S. 61, 74, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ). Third, the Court disapproved of the fact that the detainees' claims challenged "more than standard 'law enforcement operations.' " Id. at 1861 (quoting United States v. Verdugo-Urquidez , 494 U.S. 259, 273, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ). Specifically, the Court found the detainees' claims involved "major elements of the Government's whole response to the September 11 attacks, thus ... requiring an inquiry into sensitive issues of national security." Id. Finally, the Court found it of "central importance" that Abbasi was not a "damages or nothing" case. Id. at 1862. In contrast to suits challenging "individual instances of discrimination or law enforcement overreach," the Abbasi plaintiffs challenged "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners" which could be remedied with injunctive and habeas relief. Id. at 1862-63.
Not only are all four of these special factors notably absent here, but this case also presents the limited circumstances in which Abbasi indicated a Bivens remedy would exist. First, Hernandez's parents do not seek to hold any high-level officials liable for the acts of their subordinates. Instead, and strictly comporting with Bivens , plaintiffs are suing an individual federal agent for his own actions. See Abbasi , 137 S.Ct. at 1860 ("[A] Bivens claim is brought against the individual official for his or her own acts."). Relatedly, in suing an individual officer, Hernandez's parents do not challenge or seek to alter any governmental policy. To the contrary, the constitutional constraints Hernandez's parents seek mirror existing Executive Branch policy for Border Patrol agents. Department of Homeland Security regulations and guidelines already require Border Patrol agents to adhere to constitutional standards for the use of lethal force, regardless of the subject's location or nationality.[2] Furthermore, as a case against a single federal officer, this suit would not require unnecessary inquiry or discovery *827 into governmental deliberations or policy-making-certainly not any more than any other regularly permissible Bivens suit alleging unconstitutional use of force by a Border Patrol agent. See, e.g. , Martinez-Aguero v. Gonzalez , 459 F.3d 618, 620-25 (5th Cir. 2006) ; Valdez-Ortega v. Does , No. 92-7772, 1993 WL 560259, at *1-2 (5th Cir. Dec. 27, 1993). Third, this case has nothing to do with terrorism, nor does it involve a high-level governmental response to a major national security event. Rather, plaintiffs merely challenge "standard 'law enforcement operations.' " See Abbasi , 137 S.Ct. at 1861. While the majority attempts to link this case to border security, which I address separately below, there is no question that a case which involves only one Border Patrol agent and a fifteen-year-old boy is a far cry from Abbasi , which involved broad and sensitive national security policies following the deadliest terrorist attack in U.S. history. Finally, unlike the detainees in Abbasi , who had several alternative remedies including habeas relief, this is a "damages or nothing" case for Hernandez's parents. See id. at 1862. It is uncontested that plaintiffs find no alternative relief in Mexican law, state law, the Federal Tort Claims Act ("FTCA"), the Alien Tort Statute ("ATS"), or federal criminal law[3] for their tragic loss. Nor can injunctive or habeas relief redress the irreparable loss of life here. Indeed, individual instances of law enforcement overreach-as alleged here-are by "their very nature ... difficult to address except by way of damages actions after the fact." Id. Given that a Bivens cause of action is plaintiffs' only available remedy, compensatory relief by way of Bivens is both necessary and appropriate in this case. See Bivens , 403 U.S. at 407, 91 S.Ct. 1999 (Harlan, J., concurring) ("The question then, is, as I see it, whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted.").
The special factors identified by the majority do not convince me that the Judiciary is not "well suited ... to consider and weigh the costs and benefits of allowing a damages action to proceed"-particularly given the relatively straight-forward events here. See Abbasi , 137 S.Ct. at 1858. I disagree that recognizing a Bivens remedy in this case "threatens the political branches' supervision of national security." According to the majority, national security is implicated because the events giving rise to this suit took place at the border, thereby affecting border security and the operations of the Border Patrol. Relying on the Third Circuit's rejection of Bivens *828 liability in the airport security context for a First Amendment retaliation claim, the majority also reasons that implying a Bivens remedy in the transnational context "increases the likelihood that Border patrol agents will 'hesitate in making split second decisions.' " See Vanderklok v. United States , 868 F.3d 189 (3d Cir. 2017).
While the shooting in this case took place at the border, it does not follow that border security and the operations of the Border Patrol are significantly implicated. As the original panel majority noted, this case "involves questions of precisely Bivens -like domestic law enforcement and nothing more." Hernandez v. United States , 757 F.3d 249, 276 (5th Cir. 2014). Plaintiffs allege that an individual Border Patrol agent while on duty on U.S. soil shot and killed an unarmed fifteen-year-old boy. If recognizing a Bivens remedy in this context implicates border security or the Border Patrol's operations, so too would any suit against a Border Patrol agent for unconstitutional actions taken in the course and scope of his or her employment. Yet, as the majority recognizes, Border Patrol agents are unquestionably subject to Bivens suits when they commit constitutional violations on U.S. soil. See, e.g. , De La Paz v. Coy , 786 F.3d 367, 374 (5th Cir. 2015) ; Martinez-Aguero , 459 F.3d at 620-25 ; Valdez-Ortega , 1993 WL 560259, at *1-2. It make little sense to argue that a suit against a Border Patrol agent who shoots and kills someone standing a few feet beyond the U.S. border implicates border and national security issues, but at the same time contend that those concerns are not implicated when the same agent shoots someone standing a few feet inside the border.
Moreover, the practical rationale given by the majority for not recognizing a Bivens remedy-that Border Patrol agents will hesitate making split-second decisions-is one more commonly and more appropriately invoked in the qualified immunity context. See Graham , 490 U.S. at 396-97, 109 S.Ct. 1865 (holding that the excessive force qualified immunity analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation"); see also Pasco ex rel. Pasco v. Knoblauch , 566 F.3d 572, 582 (5th Cir. 2009) ("Importantly, qualified immunity purposefully shields police officers' split-second decisions made without clear guidance from legal rulings."). Given that the qualified immunity analysis already incorporates this practical concern, it is odd to invoke it at this stage, particularly when such concerns could be raised in nearly any Bivens suit against a federal law enforcement officer. See Bivens , 403 U.S. at 396, 91 S.Ct. 1999 (failing to raise concern about hesitation by federal agents in tense search and arrest situations and holding that "no special factors counsel[ed] hesitation"). Indeed, although the majority does not reach the issue of qualified immunity, Agent Mesa has and could continue to raise it as a possible defense to the constitutional claims against him.
Finally, I am troubled by the majority's reliance on a First Amendment retaliation case to raise this "national security" concern. In Vanderklok , the Third Circuit considered whether under Bivens "a First Amendment claim against a TSA employee for retaliatory prosecution even exists in the context of airport security screenings." Vanderklok , 868 F.3d at 194. While the court refused to recognize such a claim in light of the new context presented and various special factors counseling hesitation, one such special factor the court found particularly relevant was the fact that "TSA employees typically are not law enforcement officers and do not act as *829 such." Id. at 208. The court noted that "TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers." Id. Here, by contrast, Agent Mesa is a federal law enforcement officer well-trained on relevant constitutional doctrines and permissible use of force. See generally United States Customs and Border Protection, Use of Force Policy, Guidelines and Procedures Handbook (2014). In light of Agent Mesa's status as a federal law enforcement officer, the practical concerns raised in Vanderlock pertaining to non-officer TSA employees in the First Amendment retaliation context have little bearing here.
Indeed, Abbasi itself cautions against taking the very path the majority errantly takes in this case. "[N]ational-security concerns must not become a talisman used to ward off inconvenient claims-a 'label' used to 'cover a multitude of sins.' " Abbasi , 137 S.Ct. at 1862 (quoting Mitchell v. Forsyth , 472 U.S. 511, 523, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ). As one prominent legal scholar has warned, "national security" justifications are "increasingly becom[ing] the rule in contemporary civil litigation against government officers" and threaten to "dilute the effectiveness of judicial review as a deterrent for any and all unlawful government action-not just those actions undertaken in ostensibly in defense of the nation." Steven I. Vladeck, The New National Security Canon , 61 Am. U. L. Rev. 1295, 1330 (2012). When one looks to substantiate the invocation of national security here, one is left with the impression that this case more closely resembles ordinary civil litigation against a federal agent than a case involving a true inquiry into sensitive national security and military affairs, which are properly committed to the Executive Branch. See Abbasi , 137 S.Ct. at 1861. On this record, I would not so readily abdicate our judicial role given the fundamental rights at stake here. See Hamdi v. Rumsfeld , 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.").
The majority also invokes concerns about interference with foreign affairs and diplomacy as a special factor counseling hesitation. Asserting that the United States is always responsible to foreign sovereigns when federal officials injure foreign citizens on foreign soil, the majority argues that extending a Bivens remedy here implicates "delicate diplomatic matters." However, isn't the United States equally answerable to foreign sovereigns when federal officials injure foreign citizens on domestic soil? Again, the majority's argument proves too much. As plaintiffs persuasively argue, if there is a "U.S. foreign policy interest [implicated] in granting or denying a Bivens claim to foreign nationals, it is difficult to see how that interest would apply only if the injury occurred abroad." It also bears repeating that Agent Mesa's actions took place within the United States.
I also fail to see how recognizing a Bivens remedy here would undermine Mexico's respect for the Executive Branch or create tension between Executive and Judicial determinations. No case holds that a court must first consider whether the Executive Branch has found evidence of criminality before determining whether a civil Bivens remedy exists for a given constitutional violation. Further, the majority fails to acknowledge that distinct standards of proof govern civil and criminal proceedings making different outcomes in these proceedings hardly the stuff of an international diplomatic crisis. See *830 Addington v. Texas , 441 U.S. 418, 423-24, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (distinguishing between civil and criminal standards of proof). Even if one accepts that a Judicial finding of Bivens liability combined with an Executive Branch refusal to prosecute or extradite would undermine a foreign country's respect for the Executive Branch, it is difficult to explain how such concerns are only present when a foreign national is injured abroad, but not when a foreign national is injured in the United States. It is unclear how recognizing a Bivens remedy for the unconstitutional conduct of a single federal law enforcement officer acting entirely within the United States would suddenly inject this Court into sensitive matters of international diplomacy. Much as with national security, "the Executive's mere incantation of ... 'foreign affairs' interests do not suffice to override constitutional rights." Def. Distrib. v. United States Dep't of State , 838 F.3d 451, 474 (5th Cir. 2016) (Jones, J., dissenting).
The majority also points to Congress's failure to provide a damages remedy as an additional factor counseling hesitation. Noting that the language of 42 U.S.C. § 1983 limits damage remedies to "citizen[s] of the United States or other person[s] within the jurisdiction thereof," the majority first argues that Bivens as the "judicially implied version of section 1983" cannot reach further than § 1983. However, it is just as likely that by specifying "other persons within the jurisdiction" Congress intended to extend a § 1983 remedy beyond U.S. citizenship, rather than commenting on its availability for wrongful conduct by state actors with extraterritorial effects. Indeed, Congress enacted § 1983"in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers." Felder v. Casey , 487 U.S. 131, 147, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (citing Patsy v. Bd. of Regents of State of Fl. , 457 U.S. 496, 503-05, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ). Furthermore, while a Bivens action is often described as "analogous" to a § 1983 claim, Butts v. Martin , 877 F.3d 571, 588 (5th Cir. 2017), the Supreme Court has "never expressly held that the contours of Bivens and § 1983 are identical." Malesko , 534 U.S. at 82, 122 S.Ct. 515 (Stevens, J., dissenting).
The other statutes highlighted by the majority fail to indicate that Congress expressly intended to preclude a remedy in the circumstances presented here. For instance, the FTCA's exclusion of "claim[s] arising in a foreign country," see 28 U.S.C. § 2680(k), was meant to codify "Congress's 'unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power .' " Sosa v. Alvarez-Machain , 542 U.S. 692, 707, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting United States v. Spelar , 338 U.S. 217, 221, 70 S.Ct. 10, 94 L.Ed. 3 (1949) ) (emphasis added). Notably, Bivens seeks to remedy violations of United States constitutional protections, and the FTCA expressly does "not extend or apply to a civil action ... for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Additionally, any exception for federal officials under the Torture Victim Protection Act of 1991 ("TVPA") has little to say about the availability of a Bivens claim here. The TVPA provides a remedy for extrajudicial killings and torture at the hands of individuals acting under color of foreign law. See 106 Stat. 73, note following 28 U.S.C. § 1350. However, these individuals would not have been subject to Bivens liability anyways because Bivens is limited to federal officials acting pursuant to federal law. Dean v. Gladney , 621 F.2d 1331, 1336 (5th Cir. 1980) (describing Bivens as creating "a remedy against federal officers, acting under color of federal law");
*831 Kundra v. Austin , 233 Fed.Appx. 340, 341 (5th Cir. 2007) ("[A] Bivens action requires that the defendant be a federal officer acting under color of federal law.").
It is also important to note that Abbasi found Congress's failure to provide a remedy to the detainees in that case notable because Congressional interest in the government's response to the September 11 terrorist attack "ha[d] been 'frequent and intense' and some of that interest ha[d] been directed to the conditions of confinement at issue." Abbasi , 137 S.Ct. at 1862 (quoting Schweiker v. Chilicky , 487 U.S. 412, 425, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) ); see also ids="1775175" index="219" url="https://cite.case.law/us/487/412/#p425">id. (noting that at Congress's behest the Department of Justice produced a 300-page report on the confinement conditions at the relevant detention facility). By contrast here, Congressional interest in cross-border shootings has been negligible making it more likely that congressional inaction is inadvertent rather than intentional. See itation case-ids="1775175" index="220" url="https://cite.case.law/us/487/412/#p425">id. (noting that where Congressional attention is high "it is much more difficult to believe that 'congressional inaction' was 'inadvertent' "). Indeed, as courts have recognized in the statutory interpretation context, drawing inferences from Congress's silence is a difficult and potentially dangerous exercise. See Schneidewind v. ANR Pipeline Co. , 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act."); La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys. , 461 F.3d 529, 537 (5th Cir. 2006) ("As is often the case, congressional silence whispers sweet nothings in the ears of both parties."); McGill v. E.P.A. , 593 F.2d 631, 636 (5th Cir. 1979) ("The debate concerning the significance of congressional silence is almost as difficult to resolve as Bishop Berkeley's famous question concerning whether there is noise when a tree falls in the forest and no one is present to hear it."); Castro v. Chi. Hous. Auth. , 360 F.3d 721, 729 (7th Cir. 2004) (noting that "inferences from congressional silence are treacherous").
Finally, the majority asserts that "the extraterritorial aspect of this case" is itself a special factor counseling hesitation. Looking to the fact that Hernandez was standing on Mexican soil when he was shot, the majority fears the uncertain scope of Bivens liability-extending even to U.S.-based military drone operators-were we to recognize a Bivens remedy here. The majority's concern about the effects of such a decision is understandable and I do not take it lightly. However, the limited and routine circumstances presented here of individual law enforcement action as well as established Supreme Court precedent on Bivens claims in the military context assure me that there is little danger that recognizing a Bivens remedy here will open a Pandora's Box of liability.
First, as I emphasize above, this case is not sui generis among Bivens cases. In the "common and recurrent sphere of law enforcement," courts across the country routinely administer Bivens claims against federal officers for unconstitutional actions occurring within the United States. See Abbasi , 137 S.Ct. at 1857. I readily acknowledge Hernandez was standing on the Mexican side of the culvert when he was shot, but it cannot be forgotten that Agent Mesa was acting from the American side of the culvert. It is hard to understand how the mere fact that a plaintiff happens to be standing a few feet beyond an unmarked and invisible line on the ground would suddenly create a host of administrability concerns or a systemwide impact on governmental operations that would not otherwise exist if the plaintiff was standing a few feet within the United States. As ordinary Bivens litigation against a federal law enforcement officer seeking damages for unconstitutional use of force, "the legal standards for adjudicating the claim *832 pressed here are well-established and easily administrable." Engel v. Buchan , 710 F.3d 698, 708 (7th Cir. 2013) (noting that extending a Bivens remedy for alleged Brady violations under the Due Process Clause presented "no great problem of judicial interference with the work of law enforcement, certainly no greater than the Fourth Amendment claim in Bivens ").
But even the majority's concerns about liability for overseas drone operations are also unlikely to materialize. Even assuming foreign nationals injured at the hands of U.S. military personnel overseas could state valid constitutional claims-a hotly debated topic-the Supreme Court has already repeatedly rejected Bivens claims in the military context. See Chappell v. Wallace , 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (rejecting Bivens claims brought by Navy sailors against superior officers who had allegedly mistreated them on the basis of race); United States v. Stanley , 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (rejecting Bivens claims brought by a former soldier against military and civilian officials who allegedly surreptitiously dosed him with LSD to study its effect on humans). Furthermore, it is likely that such claims would actually implicate various special factors counseling hesitation specifically identified in Abbasi such as requiring a true inquiry into national security issues, intruding upon the authority of the Executive Branch in military affairs, and actually causing officials "to second-guess difficult but necessary decisions concerning national-security policy."See Abbasi , 137 S.Ct. at 1861.
In sum, this Court is more than qualified to consider and weigh the costs and benefits of allowing a damages action to proceed. This case simply involves a federal official engaged in his law enforcement duties acting on United States soil who shot and killed an unarmed fifteen-year-old boy standing a few feet away. I would elect to recognize a damages remedy for this tragic injury. As Chief Justice John Marshall wrote, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison , 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803). In this case, I would recognize a Bivens remedy for this senseless cross-border shooting at the hands of a federal law enforcement officer. Therefore, I respectfully dissent.

The majority opinion states, "The FBI reported that ... a group of young men began throwing rocks at [Mesa] from the Mexican side of the border" and asserts that Mesa "fired several shots toward the assailants." Maj. Op. at 814. That statement is not compatible with the plaintiffs' complaint in this case, which alleges that Hernández was "standing safely and legally" on Mexican soil, "defenseless," "offering no resistance," and not threatening Mesa in any way. The complaint also alleges that the FBI's statement-before discovering that a video of the incident existed-that Mesa fired at rock-throwers who surrounded him was "a false and reprehensible cover-up statement."

The regulations provide that "[d]eadly force may be used only when [a Customs and Border Protection ("CBP") officer] has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(ii) ; see also United States Customs and Border Protection, Use of Force Policy, Guidelines and Procedures Handbook 1 (2014), available at https://www.cbp.gov/sites/default/files/documents/UseofForcePolicyHandbook.pdf ("CBP policy on the use of force by Authorized Officers/Agents is derived from constitutional law, as interpreted by federal courts in cases such as Graham v. Connor , 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and Tennessee v. Garner , 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), federal statutes and applicable DHS and CBP Policies.").

After an investigation, the Department of Justice declined to seek criminal or civil charges against Agent Mesa. See Dept. of Justice, Office of Public Affairs, Federal Officials Close Investigation into Death of Sergio Hernandez-Guereca (Apr. 27, 2012), available at http://www.justice.gov/opa/pr/federal-officials-close-investigation-death-sergio-hernandezguereca. This inaction does not appear to be unusual. According to a December 2013 report by the Arizona Republic , "[t]he Department of Justice has not been able to show any cases in which it recommended civil or criminal charges against a CBP agent or officer who killed in the line of duty in at least the past six years," and "[a]n extensive review by The Republic also found no instances." Bob Ortega & Rob O'Dell, Deadly Border Agent Incidents Cloaked in Silence , Ariz. Republic (Dec. 16, 2013, 9:58 PM), available at http://www.azcentral.com/news/politics/articles/20131212arizona-border-patrol-deadlyforce-investigation.html?nclick_check=1. Additionally, the United States government refused to extradite Agent Mesa to Mexico for criminal prosecution. Brief for the Gov't of the United Mexican States as Amicus Curiae in Support of Appellants on Rehearing En Banc, at 8 (Jan. 15, 2015). The fact that one Border Patrol agent in Arizona is currently being prosecuted for a cross-border murder provides little comfort to Hernandez's parents and little deterrence for future shootings-particularly if we foreclose any hope of a damages remedy here.